1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Claudia E. Bell, Plaintiff
840 W. La Jolla, Apt 4D
Placentia, CA 92870
(951) 284-8032
Email:
Claudia Bell in Pro Per

IODGED PROPOSED ORDER
NO CV-30

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

JUN - 2 2022

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY
FEE DUE

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

8:22-cv-01095-CJC-DFMx

Claudia E. Bell, Plaintiff

vs.

OC405 Partners, JV aka

Astaldi Construction Corporation

Defendants

Case No.: Insert Case Number

**COMPLAINT FOR DAMAGES**
**42 U.S. Code § 1983**
**Demand for Jury Trial**

1. Wrongful Termination
2. Retaliation Termination (Title VII)
3. Discrimination and Harassment (Title VII)
4. Discrimination and Harassment (FEHA)
5. Retaliation for Complaints of Harassment and Discrimination
6. Failure to Prevent Harassment and Retaliation
7. Intentional Infliction of Emotional Distress
8. Disability Discrimination
9. Age Discrimination
10. Hostile Work Environment
11. Defamation

1

Complaint for Damages

**Nature of Case**

1)  This is an action for an award of damages, relief, attorneys' fees and other relief on behalf of Claudia Bell ("Plaintiff), a former employee of Defendant OC405 Partners, JV aka Astaldi Construction Corporation ("Defendant"), who has been harmed by the Defendant's discriminatory employment practices.

2)  This action arises under Title VII of the Civil Rights Act of 1964,42 U.S.C. §2000(e), etseq., as amended by the Civil Rights Act of §1991, at 42 U.S.C.§ 1981 (a) ("Title VII"), the Americans with Disabilities Act, 42, U.S.C. §12101, etseq. ("ADA").

3)  COMES NOW, Claudia Bell the above name Plaintiff, this case is a civil action seeking damages and relief against Defendants for committing acts against ("Plaintiff") and for depriving Plaintiff of her rights secured by the United States Constitution and the California Constitution in violation of the public policy of the United States of America and the State of California. The claims arise from events in the Document Control Department 2nd Floor. Plaintiff engaged in a protected status. Plaintiff believes she was terminated on a pretext of bad work performance in retaliation for making a complaint because her co-worker was disclosing information about her medical and mental condition which the co-worker should not have had privy to. This action

Complaint for Damages

is brought by Plaintiff for protected activity of complaining about the

discrimination directly to Defendant OC405 Human Resources Manager, Bob

Rosado and Defendant Paul D. Straznickas her direct supervisor. Plaintiff also

complained about being treated differently throughout her employment with

OC405 Partners, JV because of her race, (Black) ethnicity, skin color, age (over

50), and disability. The unlawful conduct on the part of the above named

Defendants, causing Plaintiff to be subjected to discrimination based on age,

race, color, ethnicity/ disability, and retaliation because of a protected activity.

## JURISIDICTION AND VENUE

4)      Jurisdiction of this Court is invoked pursuant to 28 U.S.C.

§§451,1331,1337,1343, and 1391. This action is authorized and instituted

pursuant to 20 U.S.C. 1706 requiring the appropriate United States District

Court to exercise jurisdiction. 42 U.S.C. § 1981, Civil Rights Act of 1991, as

amended, states that employment discrimination and retaliation cases may be

filed in the United States that employment discrimination and retaliation cases

may be filed in the United States District Court. This Court has pendent

jurisdiction over Plaintiff's state claims, both administrative and common law,

because they arise out of the same nucleus of common facts on which Plaintiff's

federal discrimination claims are based. Pursuant to 28 U.S.C. § 1367(s),

Complaint for Damages

federal courts have the discretion to adjudicate state-law claims that are transactionally related to the federal claims.

5)      Plaintiff has suffered and continues to suffer actual injuries as a result of the intentional, malicious, viscous and unlawful conduct on the part of the above-named defendants. The injuries can be traced to the challenged action and conduct in this matter. Plaintiff received her notice of Right-to-Sue from the EEOC. Attached as Exhibit "A" is a true copy of the right-to-sue notice from EEOC dated March 10, 2022. Attached as Exhibit "B" IS A TRUE COPY OF THE Charge of Discrimination filed with the EEOC dated January 8, 2020.

Additionally, jurisdiction is established because Plaintiff resides within the jurisdiction of the United States District Court in and for the Central District of California.

6)      OC405 Partners, JV is doing business within the jurisdiction of the United States District Court/Central District.

7)      WHEREFORE Plaintiff prays that this Court would grant a hearing and set the date of the hearing to hear the foregoing complaint in its entirety.

8)      Plaintiff intends to file an Amended Motion and Brief which support the above stated claims after the Court date is set.

**PARTIES**

Complaint for Damages

9)      Plaintiff, Claudia E. Bell (Plaintiff) at relevant time Plaintiff was 68 years of age, and a longtime resident of Orange County, California and is within the jurisdiction of the United States District Court.

10)     Defendant, OC405 Partners JV aka Astaldi Construction Corporation 3100 West Lake Center Drive, Santa Ana, Ca 92704 is doing business within the jurisdiction of the United States District Court/Central District.

11)     Defendant Paul D. Straznickas, on information and belief, is presently a resident of Orange County. At all relevant times herein, defendant was employed by OC405 Partners, Joint Venture as a Configurations Manager and Supervisor of Document Control 2nd Floor and is within the jurisdiction of the United States District Court/Central District.

12)     Defendant Bob Rosado, Human Resources Manager at relevant time was employed by OC405. I have no information if he is within the jurisdiction of the United States District Court/Central District.

13)     Defendant Traci Boyer, on information and belief, at relevant time was employed by OC405 as Document Lead, Document Control Team, and resides within the jurisdiction of the United States District Court/Central District.

14)     Defendant Traci Paraday, on information and belief, at relevant time was employed by OC405 as Team Lead, Document Control Team, and resides within the jurisdiction of the United States District Court/Central District.

by certain Defendants, the remaining Defendants or Defendant confirmed and ratified said acts and omissions.

20)     Plaintiff is informed and believes and thereupon alleges, that all times material herein each Defendant was dominated and controlled by his/her co-Defendant, and each was the alter-ego of the other.

21)     Whenever and wherever reference is made in this complaint to any act or failure to act by a Defendant or Defendants, such allegations and references shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly, and severally.

## STATEMENT OF FACTS

22)     Plaintiff came to OC405 Partners through the State Department of Rehabilitation (DOR) on their On-the-Job Training Program (OJT). For two months, DOR paid Plaintiffs salary. Plaintiff applied with DOR through a Recruiting Program because of her disability and her hopes of getting a job with a state agency, but accepted interviews with various companies.

23)     Plaintiff also has over 40 years' experience in clerical, administrative, Data Entry, Word Processing and Database Management. Plaintiff attended Southland College and Kellogg Community College and earned Certifications in Office Clerical and Office Procedures and Word Processing. Plaintiff also

attended Santa Ana College from 2009 – 2011 earning a Certification as a Microsoft Certified Applications Specialist #7760369.

24)    Plaintiff has also owned and operated/managed her own commercial business, Perfect Page Printing which was based on the brand of Kinkos from 1993-2005 and used the Historical Black Colleges and Universities district in Atlanta as her location and students as her beginning target market. Plaintiff was the decision maker for all print and materials. Plaintiff hired, trained, and managed over fifteen employees over the course of time.

25)    Plaintiff has held jobs with Fortune 500 companies, HBCU Colleges such as Morehouse School of Medicine, Spelman College, Clark Atlanta University, IBM, Word and Brown and University of California Irvine.

26)    Plaintiff has held a host of other clerical and administrative jobs as well on a temporary basis, simply because she was raising a Special Needs grandchild and wanted to have flexibility in her time to care for him.

27)    Plaintiff was more than qualified at all times to perform her duties and any clerical task in OC405 Partners Document Control Department of which she did.

28)    Plaintiff never had to be disciplined or counseled in way regarding her behavior, attendance, or timeliness.

29)     Plaintiff began her work with OC405 Partners on March 11, 2019, as a Data Management Assistant. After Plaintiff received training in the SharePoint Materials Database from Paul Straznickas for all Construction Materials, she received all her daily work directly from Construction Managers Manny Yogarajah and Cyrus Shahinpar, PQMs regarding SharePoint Database.

30)     Plaintiff worked independently for the first four months of her employment with the SharePoint Database.

31)     Plaintiff also received four written Progress Reports from her supervisor and trainer that went directly to the Department of Rehabilitation (DOR). Plaintiff never heard any complaints from Construction Managers. (Exhibit Progress Reports)

32)     Added to Plaintiff's duties was the Daily Aconex Register, an Excel spreadsheet that Plaintiff created from the Aconex Database and sent out every morning.

33)     Plaintiff's supervisor asked her if she had already done this work before and seemed so genuinely impress by the end of March 2019, he asked the Document Control Team to begin training her on their documents of Submittals, letters and other databases they used so she could be a back-up when they were behind or out of office. (Exhibit ___) March 29, 2019

Complaint for Damages

34)      Plaintiff received a full-time job offer with OC405 Partners and was officially hired on May 6, 2019, with a small increase in salary.

35)      Plaintiff learned the submittals procedures within a month's time, while also learning numerous other documents and their procedures involving the Aconex Database.

### Fact

36)      The EEOC Affidavit Statements from Paul Straznickas, Configurations Manager, and the Witness Statements from Bob Rosada, Traci Boyer, and Traci Paraday corroborates their role in in the harassment, falsifying documents, discrimination, undermining my work and skills and other defamatory actions, and treatment I received at OC405 Partners in the Document Control Department. It is something no should have to endure on their job.

### COMPLAINT

37)      Under the Rehabilitation Act of 1973, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII").  The employer engaged unlawful employment discrimination in violation of Rehabilitation Act of 1973 and in violation of Title VII by engaging in discriminatory and retaliatory acts against Plaintiffs disability (Anxiety and Depression) and for her participation in a protected activity.  The Plaintiff was

Complaint for Damages

15) Defendant, Alexis Martinez Romero, Administrative Assistant, on information and belief, at relevant time was employed by OC405 as Administrative Assistant and resides within the jurisdiction of the United States District Court/Central District.

16) Defendant, Brenda Cortez, on information and belief, at relevant times herein, was employed by OC405 Partners, Joint Venture as a Receptionist and Data Entry Clerk, and resides within the jurisdiction of the United States District Court/Central District.

17) Defendant Azzam Saed, on information and belief, at relevant times herein, was employed by OC405 Partners, Joint Venture and resides within the jurisdiction of the United States District Court/Central District.

18) Plaintiff is informed and believes and, on that basis, alleges, that each named defendant is responsible in some manner for the acts and failures to act herein alleged, and that Plaintiffs injuries as herein alleged were legally caused by the conduct of such defendant.

19) Plaintiff is informed and believes and thereupon alleges that, at all times material herein, each of the Defendants was the agent or employee of, and/or working in concert with, his/her co-Defendants and was acting within the course and scope of such agency, employment and/or concerted activity. Plaintiff alleges that to the extent certain acts and omissions were perpetrated

Complaint for Damages

wrongfully terminated and unlawfully discriminated and retaliated against in terms and conditions of her employment.

38)      Plaintiff was wrongfully terminated on 10/9/2019. Not only was her colleague spreading her medical history, the colleague also was spreading that she was mentally ill, was token at the company and tax write off for the company and that is why the company didn't care what happened to me. A complaint was filed with Human Resources because a co-worker informed Plaintiff that her colleague was discussing her personal medical information with other co-workers and throughout the company in violation of the ADA and Title VII.

39)      Bell states that only Plaintiff's manager and Human Resources knew about Plaintiff's medical disability information to provide a reasonable accommodation.

40)      After the co-workers found out from colleague that Plaintiff came through the Department of Rehabilitation (DOR) that co-worker also asked me "couldn't they have sent someone else?". Plaintiff was discriminated against based on her race (Black) age (over 50) and disability.

41)      Bell was held to an unfair standard of conduct because defendants "perceived her to be the stereotypical 'angry Black woman, just because she was Black. Plaintiff was also told on an occasion, 8/9/19 that she should go in her

department (Document Control) and act like the "stereotypical angry black woman" because she knew who was making her life a living hell over there.

42)      Plaintiff filed a Complaint with Human Resources according to the OC405 Partners Employee Handbook Policy on October 4th, 2019, based on the information that Plaintiff had just heard. Plaintiff refused to confront colleague in the workplace because the atmosphere was already hostile to the point that a reasonable person could not tolerate it. Plaintiff thought it best that Human Resources get involved to correct the matter.

43)      Plaintiff feels Human Resources did a superficial investigation into the complaint of Plaintiff and called her complaint "Hearsay."

44)      Even though HR Manager called it hearsay, Plaintiff felt it had already affected her professional reputation in the workplace, Plaintiff's professional character, her work, and still, until this day, suffers mental injuries due to anguish and emotional distress and stress as a result of the disclosure of her medical information along with other defamations regarding her ability to do her work. 42 U. S. C. § 1981—

45)      Plaintiff had no idea how long this misinformation had been floating around the office about her being mentally ill. Plaintiff felt people started seeing what they heard about her, not the work she was doing or had done. This

misinformation deprived her of rights and privileges, constituted to her by the Constitution of the United States.

46)      Plaintiff had a documented history of good performance prior to her filing a charge with Human Resources and there was no written documentation of performance complaints. Human Resources and Manager refused to take immediate and appropriate preventive and corrective action that my co-workers were falsely disclosing about me. Plaintiff was terminated on after filing a complaint on 10/04/2019, on the pretext of bad work performance.

47)      Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating due to race, color, religion, sex, or national origin. The law also prohibits employers from retaliation against an employee because they have filed a complaint about discrimination

48)      Plaintiff also experienced personal humiliation, cruelty, harassment, and ridicule from Defendants. For instance, on October 8 and the morning of October 9th, there were groups of people standing around and next to the Managers cubicle and they were discussing the manager letting me go. Traci Paraday looked Plaintiff directly in the face and announced to the group, "Paul is firing Claudia." Her statement was malicious, intentional and hurtful.

49)      My supervisor retaliated after I filed two previous Complaints with HR regarding the conduct and discrimination from my co-workers on July 24th and August 14, 2019.

50)      On 7/24/2019 Plaintiff emailed her concerns in a letter to Human Resources: She stated she was writing this letter to update Management and HR on a few of the concerns that she expressed at a prior meeting with Paul regarding her work environment.

51)      Approximately in June 2019 Plaintiff expressed some concerns about the treatment she receives from fellow colleagues. She let management know that she has been met with hostility from Traci Boyer.

52)      Plaintiff let management know that she felt this was due to the fact that they did not want her working there and in fact are aggressively trying to promote someone else for her position. Plaintiff again addressed some of the issues that she was being faced with:

53)      Since April, Paul requested that Plaintiff was trained on Submittals. Plaintiffs' trainer refused to do this for quite some time despite urging from Paul and only recently in June began to follow directions. However, it appears that she has been actively training a receptionist to do the same job that Plaintiff does. I'm told this person is now being promoted and is coming to the floor. Plaintiff feel this colleague has purposely refrained from showing her how to

Complaint for Damages

properly complete the entire submittal process because she has been trying to lead management to believe Plaintiff is incompetent and somehow slow—basically incapable of doing the work, while simultaneously promoting her friend.

54)      Plaintiff suffered Physical harassment and workplace violence from her colleague when the colleague walked into her cubicle and threw a box and large GSO envelopes on her desk as hard as she could and begin to rant with anger until spittle was coming from her mouth. Paul, you stated he overheard some of this and would speak to them, citing that one individual in particular is young and so some of her behavior should be excused presumably due to her immaturity.

55)      Plaintiff's colleagues publicly ridicule her for any slight mistakes she may have made in front of everyone, shaming her in an attempt to make her feel incompetent, even when she's been told she's done an excellent job.

56)      One colleague has made statements to Plaintiff such as "I don't ever want to touch the same paper twice" (meaning she has pre-judged Plaintiff as incompetent because she's African American, pre-judged her skills and won't do the work correctly) and "colleague stated she has been there a long time, I'm not going anywhere and will be here to see others leave"—this was stated to Plaintiff when she first began working here.

57)     Even after Plaintiff spoke to management, there have been several other incidents of harassment and intimidation.

58)     On one day, Plaintiffs colleague announced she was leaving for the weekend. Plaintiff was asked if she were leaving and when she said that she was going to stay a little longer to finish up documents, the colleague announced she was also going to stay as well. She would not leave the building until she walked Plaintiff out that night.

59)     On another occasion, something similar happened. My colleague announced she was leaving and asked if Plaintiff were leaving. Plaintiff stated she was not and planned to stay longer to finish work. The colleague left the building. Plaintiff left approximately 15 – 20 minutes later, only to find the colleague waiting for her in the parking lot. She would not pull away until she saw that Plaintiff did.

60)     Plaintiff is writing you because her colleague's behavior has not changed since we spoke and, in some cases, such as the parking lot incident, they have gotten worse. Plaintiff again informed you that she is disabled. In particular, I suffer from anxiety and depression.

61)     The behavior displayed by these individuals is causing Plaintiff to feel very anxious coming to work and has left her depressed and crying at home. Plaintiff has expressed that she loves her job. Plaintiff loves what she does and

Complaint for Damages

that she does not plan on leaving and would love to continue to make valuable contributions. However, this behavior must be addressed. Plaintiff is now having anxiety about coming to work and fulfilling her role.

62)     Recently, it was announced that Plaintiff should sit even closer to these individuals so they can work as a team. As Plaintiff has outlined, these individuals are not interested in working as a team and have in fact tries to undermine everything Plaintiff does and smear her reputation for excellence. Plaintiff would appreciate it if you could address these concerns and refrain from seating her closer to these individuals as she believes their behavior would become worse with less ability to monitor them.

63)     All Plaintiff wanted to do was work in a positive environment in which she was respected and valued as much as everyone else. Again, she really does enjoy what she does and despite efforts to obstruct her ability to learn things, she's taken time out to try to learn and perfect whatever she can.  Plaintiff is perfectly capable of doing submittals as well as taking on other tasks. Further, Plaintiff is not antisocial. In fact, she's heard she's quite kind if you take the time to get to know her. Plaintiff has not done anything to these women to incite such viciousness and it is quite frankly very hurtful. Please advise as to how you would like to proceed. Thank you.

Complaint for Damages

64)     Work was continuously withheld from me by my colleagues. After Plaintiff spoke up about it, she was told by her my manager that she had "overstepped the line." Email dated 8/7/2019.

65)     After I made a complaint to Human Resources, Plaintiff was humiliated on a daily basis if she asked any questions regarding training, specifically submittals. She would be told: "I don't feel you can do this and when I find something I feel you can do, I'll let you know." 42 U.S. Code § 12203 - Prohibition against retaliation

66)     When this colleague did give Plaintiff a submittal, it was with a condition that she, just send it to the database, she had already completed it.

67)     09/26/2019 Plaintiff's Manager has been retaliating and harassing and hostile towards me. He became viciously angry, his face turning red and he rose up from his chair and he got very close to plaintiff's body, very close, right in her face and belittled and degraded me. I just asked a question on SharePoint.

68)     Plaintiff was the recipient of retaliation in the form of harassment, loud discipline, half-training, rescinded training, exclusion, discrimination, and disability discrimination, and retaliation from Defendants for reporting their conduct in July and August 2019. Despite making Human Resources aware that I felt the Document Control Department did not want me on their team, Human Resources said he didn't get that feeling. He took no correct measures.

69)     There was nothing my colleagues would let me do to allow me to work together with them as a team.

70)     From August 20th to August 29th, Plaintiff kept getting a " couldn't sign off on it because other people were on, and the work would be lost if I signed off. Files were moved and tampered with on my computer during this time.

71)     On 09/05/2019 Plaintiff met to discuss the Investigation of unauthorized users having access to my computer and deleting work. After this meeting, Paul went back to the team and announced loudly to the group that "we can expect much more chaos up in here" while looking directly at me.

72)     The Aconex Database was down for five (5) consecutive weeks. Plaintiff was unable to send the Aconex Daily Registry. The co-workers in and outside of Document Control were blaming me on the fact that my colleague was telling everyone that I didn't understand the database or my work.

73)     The Manager was able to contact the company after about two weeks and he was informed the hyperlinks were broken and Aconex was down worldwide. He sent out an email explaining that to the co-workers that Aconex and Oracle were merging software during this time. (Exhibit Daily Aconex Register).

74)      The letter I was accused of not sending by OC405 attorneys in a timely manner is listed on the Excel file for the Daily Register dated 8/9/2019 during the time the hyperlinks were broke.

75)      7/16/2019 The Document Team Lead was training two other colleagues on RFIs. Plaintiff was excluded from the training and subjected to ridicule by the Team Lead making the statement to colleagues in my presence, *"say if someone sent you a Submittal or say Plaintiff sent you a Submittal, Oh, forget about Plaintiff sending you a submittal"* then the Team Lead used someone else's name instead and all three laughed out loud.

76)      After leaving the workplace Plaintiff had to email HR and ask for a copy of the Discharge form she had just signed. (Exhibit Discharge from OC405 Partners)

77)      After Plaintiff filed a Charge with the Equal Employment Opportunity Commission on 1/8/2020. When she received the Position Statement from OC405s Attorneys, an additional page of Disciplinary actions had been added to the original one that she received on 10/9/2019 directly from Human Resources Manager Bob Rosado. The Disciplinary Actions are totally false and were created after Bell was terminated, and only used as a Pretext to show EEOC that my termination was non-discriminatory or retaliatory. (Exhibit 2nd Discharge after Plaintiff was terminated)

Complaint for Damages

78)      Also in the Position Statement was a letter that Document Control Team had falsified by cutting, copying and pasting over the date, footers and headers, the actual letter number had been copied over as if it had been done by Plaintiff on 8/20, the same day as when I saw the message on my computer that it was in use by other people.

79)      Further falsified documents in the Position Statement where the Document Team, using my name from a previous transmittal, also cut and pasted and copied over a Transmittal sheet several times as if the transmittal sheet was proof, I had input the letter. They could not submit a true transmittal sheet to EEOC.

80)      During the investigation phase of my complaint on 10/04/2019, Plaintiff noticed that the Document Control Database had been stopped and sometimes locked, preventing her from retrieving any of the work coming through the Database for Document Control.

81)      Many other falsified documents were presented through the Position Statement that were not true, specifically one where I was accused of calling myself a racial slur, the N-word.

82)      An Iphone message that was clearly cut, copied, and pasted over was given to OC405 attorneys claiming I called myself a racial slur. The attorneys presented it to EEOC.

Complaint for Damages

83)      A false document created by the Team Lead where she showed OC405 a shirt with a witch on, but the actual document is a video of a witch running someone out of the office with a broom dated 10/09/2019 about 3pm. (facebook).

84)      Plaintiff never knew and was never told that Traci Paraday was in a supervisory or managerial position. Plaintiff came in as Data Management Assistant to Paul Straznickas working in Sharepoint.

85)      Plaintiff only came in direct contact with Paraday about four months after Bell started at OC405. When Paul introduced Plaintiff to the Document Control Team and insisted, they all train her in their duties to be a back-up. Plaintiff was never managed by Paraday at any time, ever in my employment by OC405 Partners. Paraday was to train me on the Mail database and the procedures for sending the mail to Sacramento. That's why Plaintiff was surprised to learn it was she who wrote a falsified Disciplinary Action on her before and after she was terminated.

86)      In Retaliation for filing a Complaint with Human Resources on July 24th, 2091, my training was suspended and then stopped. Plaintiff was not being permitted to move through the process of training for any growth in the company. As a result of the total impact by the conduct and sabotage of my work and undermining of skills by Defendants and their agents, the Plaintiff has

suffered with regard to the conditions of her employment, the training and how I was limited to only work in SharePoint Database.

87)      WHEREFORE, Plaintiff seeks these remedies and further relief as stated below.

## STATEMENT OF FEDERAL & STATE CLAIM FIRST CLAIM FOR RELIEF

(Violation of Public Policy Against Wrongful Termination in Violation of the Civil Rights Act of 1991, as Amended, the California Constitution, Article I, § 8; and the California Government Code § 12940(a) for Race/National-Origin Discrimination)

88)      The allegations and attachments set forth above in paragraph 1 through 126 inclusive, are incorporated into the claim for relief by reference as if set forth in full.

89)      Plaintiff is of African-American decent and worked in an office that is predominately White

90)      Plaintiff was retaliated against because she participated in opposing and complaining about the discriminatory treatment against her and her immediate termination. Now she has only been able to work at part-time jobs in a non-office environment as a seasonal worker.

91)      WHEREFORE, Plaintiff demands Judgement against all OC405 Partners, JV Defendants.

## STATEMENT OF A FEDERAL CLAIM SECOND CLAIM FOR RELIEF

(Violation of the Civil Rights Act of 1866

[As Amended, 42 U.S.C. § 1981] Against All Defendants)

92)      The allegations and attachments set forth above in paragraph _through, inclusive, are incorporated into this claim for relief by reference as is set forth in full.

93)      Section 1981 provides that all persons within the jurisdiction of the United States must be afforded the same rights and the full and equal benefit of all laws and proceedings for the security of persons and property enjoyed by white citizens regardless of a contract but also during the duration and life of the contract.

94)      Plaintiff was scrutinized, defamed, suspended, and subsequently terminated because of the color of her skin. No other White employee was treated in the manner as Plaintiff. Plaintiff stepped outside of the boundaries of acceptable conduct on the part of African American (being uppity) and exercising her right to complain about unlawful discrimination and retaliation) and exercising her right to complain about unlawful discrimination and retaliation) and, therefore, was denied the full benefits and privileges of her employment because she is African American. Plaintiff, in the end, was

terminated from her position as Data Management Assistant and backup to the Document Control team.

95)     WHEREFORE, Plaintiff requests relief as set forth below.

## STATEMENT OF STATE & FEDERAL CLAIM THIRD CLAIM FOR RELIEF
(Violation of the California Government Code, § 12900, et seq. and the

EEOC for <u>Age Discrimination</u> in Employment Against OC405)

96)     The allegations and attachments set forth above in paragraph 1 through 46, inclusive, are incorporated into this claim for relief by reference as if set forth in full.

97)     Plaintiff is over the age of 40 years and has been discriminated against because of her age. She performed her job duties well, with good Progress Reports until Defendant Paul Straznickas, my supervisor and Traci Paraday, decided to involuntarily terminate Plaintiff and replace her with one who was not African American and younger than she was. Plaintiff was replaced by a young (white) male whom Paul trained while I was still on the job. His training began around August 20, 2019, when the manager had me make an S drive for my computer. After I was terminated, the job title changed so OC405 would not be in violation of wrongful termination.

98)     WHEREFORE, Plaintiff demands judgement against defendant

Complaint for Damages

**STATEMENT OF FEDERAL & STATE CLAIM FIRST CLAIM FOR RELIEF**

(Violation of the EEOC and FEHA for Unlawful <u>Retaliation</u>

99)        The allegations and attachments set forth above in paragraph 1 through 56, inclusive, are incorporated into this claim for relief by reference a if set forth in full.

100)       Plaintiff is of African-American descent and worked in an office which was predominately White and other workers were majority White and the supervisors were all White.

101)       Plaintiff was retaliated against because she participated in opposing and complaining about the discriminatory treatment against her before her immediate termination. Plaintiff engaged in the protected activity of complaining and opposing unlawful discrimination leveled against her. She thereafter suffered and was subjected to an adverse employment decision by OC405 and its agents. There was a causal link between the protected activity and the adverse action. Plaintiff was not only engaged in protected activities under the EEOC and FEHA, but she also was subjected to the adverse actions which led to and included her termination.

102)       WHEREFORE, Plaintiff demands judgment against Defendant OC405 Partners JV.

**STATEMENT OF STATE CLAIM FIFHT CLAIM FOR RELIEF**

Complaint for Damages

(Intentional Infliction of Emotional Distress Against All Defendants)

103)         Plaintiff realleges and incorporates herein by reference each and every

allegation set forth in Paragraph 1 through 46, inclusive, of this complaint as

stated above.

104)         Plaintiff was harassed, retaliated against, threatened with termination,

and then terminated immediately following a complaint to HR in a major part

because of her complaints, opposing, and protesting the discrimination against

her based on race, national origin, ad age discrimination. The retaliation and

harassment leveled against her were in violation of the California Fair

Employment and Housing Act. The defamation of her professional reputation

and character, marginalizing her and her work and eventually Plaintiff was

terminated.

105)         Defendants acted with (1) the intent to inflict the injury upon Plaintiff

and (2) the realization that the injury of losing her job was substantially certain

to result from Defendants' conduct, must most especially because of Plaintiff's

race/national Origin. Plaintiff's emotional distress was and is now severe,

substantial and enduring and was actually caused by the Defendant's pervasive

and professionally fatal conduct.

106)         As a direct and proximate result of Defendants' action against Plaintiff,

as alleged above, Plaintiff has suffered special damages, including but not

limited to loss of wages, bonuses, deferred compensation, and other employment benefits, in an amount to be proven at the time of trial, in excess of the minimum jurisdictional requirements of this Court.

107)      Defendants used Plaintiff's race/ethnic origin in order to discriminate against her, placed her on a suspension, told other employees in the Department Plaintiff was incapable and incompetent and, therefore could not work on Submittals, letters and other documents in the Document Control Department on the 2nd floor any longer.

108)      As a further direct and proximate result of Defendants unlawful discrimination against Plaintiff, as aforesaid, Plaintiff has sustained general damages for severe physical, mental, and emotional injuries, distress, harm and damages in an amount to be proven at the time of trail, in excess of the minimum jurisdictional requirements of this Court.

109)      WHEREFORE, Plaintiff demands judgement which is more fully stated below.

### STATEMENT OF STATE CLAIM SIXTH CLAIM FOR RELIEF
(Negligent Infliction of Emotional Distress Against All Defendants)

110)      Plaintiff realleges and incorporates herein by reference each and every allegation set forth in Paragraph 1 through 46, inclusive, of this complaint as stated above.

111)     Because of the special relationship between an employer and employee

and the policy of the State of California to prevent prohibited racial and

national-origin discrimination, age discrimination, retaliation and harassment in

the workplace, national-origin, age, and retaliation discrimination against

Plaintiff.

112)     OC405 breached its duty of care which was the proximate cause of the

injuries suffered by Plaintiff because she is an African American female over

the age of 50 years.

113)     WHEREFORE, Plaintiff seeks these remedies and further relief s stated

below.

## STATEMENT OF STATE CLAIM SEVENTH CLAIM FOR RELIEF

(Defamation Against All Defendants)

## STATEMENT OF STATE CLAIM EIGHT CLAIM FOR RELIEF

12940 GC — Employers, labor organizations, employment agencies and other

persons; unlawful employment practice; exceptions [FEHA wrongful termination /

retaliation]

## STATEMENT OF STATE CLAIM FIFHT CLAIM FOR RELIEF

(Intentional Infliction of (Emotional Distress Against All Defendants)

114)     Harassment in the workplace is a type of employment discrimination,

which violates the Civil Rights Act of 1964.

Complaint for Damages

115)     Plaintiff realleges and incorporate by this reference the allegations of

paragraphs 1 through 84 Defendants, intentionally and with malicious motive,

engaged in the wrongful acts described herein, which acts were outrageous and

were calculated to cause Plaintiff mental anguish, humiliation, and emotional

distress. The wrongful acts described herein are not normally expected to arise

in the workplace, and are not a normal incident of one's employment

### STATEMENT OF STATE CLAIM NINE CLAIM FOR RELIEF
Government Code 12940(j) GC — California harassment law.

Government Code 12940(a) GC — California employment

discrimination law.

### STATEMENT OF STATE CLAIM TEN CLAIM FOR RELIEF
Government Code 12940(a) GC — California employment

discrimination law.

116)     Plaintiff realleges and incorporates herein by reference each and every

Allegation set forth in Paragraph 1 through 46, this complaint as stated above.

117)     At or around 10/03/ 2019, Plaintiff learned she was being labeled as too

incompetent to continue working at OC405 after months of good performance

which was rated independent which means Plaintiff did not have to rely on

supervision. She was forced to work in humiliation because of the allegations

were spread to other co-workers at OC405 by these individual Defendants

regarding her incompetence and the need to immediately fire Plaintiff.

Complaint for Damages

Plaintiff's colleagues were told and knew of her termination and the reasons for the same.

118)      Plaintiff learned Defendants had published to uninterested parties that she was not competent to continue to work in the Document Control Department at OC405.They humiliated her in front of these colleagues as they forced her from the premises in same which brought on her severe panic attacks. Plaintiff was exposed to disgrace in that her professional reputation and occupation has been injured. The statements to colleagues and members of the OC405 employees were concerning Plaintiff and were false.

**WHEREFORE, Plaintiff seeks these remedies and further relief as stated below**

**PRAYER FOR RELIEF**

119)      WHEREFORE the Plaintiff prays that an Issuance of a declaration of rights declaring that Defendants' retaliatory conduct as alleged in this complaint violates both the laws of the United States in the EEOC and the laws of the State of California in the FEHA as alleged in this complaint.

120)      An award of monetary damages sufficient to fully compensate Plaintiff for all losses she has suffered as a direct and proximate result of OC405's unequal discriminatory, and retaliatory treatment of her.

Complaint for Damages

121)     An award of monetary damages sufficient to fully compensate Plaintiff for the emotional trauma suffered by her, including damages for mental distress, emotional pain, loss of enjoyment of life, and other nonpecuniary losses.

122)     An Award of monetary damages as mandated by civil rights laws, both federal and state.

123)     An award of monetary damages as mandated by the Fair Employment and Housing Act.

124)     An Award of punitive damages against all Defendants which includes The Document Control Team.

125)     An award of damages pursuant to other relevant provisions of law.

126)     An award of such other and further relief as the Court considers proper and just.

## DEMAND FOR JURY TRIAL

127)     Plaintiff Claudia Bell hereby demands a trial by jury of all claims for relief for which a jury trial is available as a matter of right

Dated:      May 31, 2022

Respectfully submitted,

X _____
Claudia E. Bell, Pro Per

Complaint for Damages

EXHIBIT A


DETERMINATION AND NOTICE OF RIGHTS

480-2020-00915

RIGHT TO SUE LETTER

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Los Angeles District Office**
255 East Temple St ,4th Floor
Los Angeles ,California ,90012
(213) 785-3090
Website: www.eeoc.gov

## <u>DETERMINATION AND NOTICE OF RIGHTS</u>

(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 03/10/2022

To:  Ms. Claudia E. Bell
840 W. La Jolla Apt 4d
Placentia, CA 92870

Charge No: 480-2020-00915

EEOC Representative and email:        Lina Williams
Federal Investigator
lina.williams@eeoc.gov

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 480-2020-00915.

On Behalf of the Commission:

Digitally Signed By:Christine Park-Gonzalez
03/10/2022

Christine Park-Gonzalez
Acting District Director

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Los Angeles District Office**
255 East Temple St ,4th Floor
Los Angeles ,California ,90012
(213) 785-3090
Website:  www.eeoc.gov

**Cc:**
Marie Burke Kenny, Esq.
PROCOPIO CORY HARGREAVES & SAVITCH LLP
c/o OC405 PARTNERS
525 B St, Suite 2200
San Diego, CA 92101

Clint Engleson
Associate
PROCOPIO, CORY, HARGREAVES & SAVITCH LLP
c/o OC405 PARTNERS
525 B St, Suite 2200
San Diego, CA 92101

Please retain this notice for your records.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):** The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

**If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.**

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

- ➤ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.
- ➤ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
- ➤ **Only one** major life activity need be substantially limited.
- ➤ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
- ➤ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
- ➤ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage:**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.

Enclosure with EEOC Notice of Closure and Rights (Release Date)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

We recommend that you and your attorney (if you retain one) review the resources at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 480-2020-00915 to the District Director at Christine Park-Gonzalez, 255 East Temple St 4th Floor
Los Angeles, CA 90012. You can also make a FOIA request online at
https://eeoc.arkcase.com/foia/portal/login.

Enclosure with EEOC Notice of Closure and Rights (Release Date)

> ➤ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

EXHIBIT B

CHARGE OF DISCRIMINATION/RETALIATION

EQUAL EMLOYMENT OPPORTUNTITY COMMISSION

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 480-2020-00915 |

| California Department Of Fair Employment & Housing | and EEOC |
|---|---|

*State or local Agency, if any*

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Claudia E. Bell | (951) 284-8032 | 1951 |

| Street Address | City, State and ZIP Code |
|---|---|
| 840 W. La Jolla, Apt 4d, Placentia, CA 92870 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| OC405 PARTNERS | 101 - 200 | (858) 251-2200 |

| Street Address | City, State and ZIP Code |
|---|---|
| 3100 W. Lake Center Drive, Santa Ana, CA 92704 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

**DISCRIMINATION BASED ON** (Check appropriate box(es).)

☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN

☒ RETALIATION ☒ AGE ☒ DISABILITY ☐ GENETIC INFORMATION

☐ OTHER (Specify)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 03-11-2019 | 10-09-2019 |

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began my employment with OC405 Partners JV on or about March 11, 2019, and my last position with the company was a Data Management Assistant. Around March 2019, my employer became aware of my medical condition. From on or about March 11, 2019 until the day of my termination on or about October 9, 2019, I was subjected to the different terms and conditions of employment by Paul Straznickas (White), Computer Configuration Manager/Immediate Supervisor, and Bob Rosado (Black), Human Resources Manager, which included, but were not limited to: Not being provided with an adequate training on additional job-related duties. Additionally, from on or about May 6, 2019, until the day of my termination on or about October 9, 2019, I was subjected to a hostile work environment, which included, but was not limited to: hearing Traci Boyer (White) Document Control Lead, make constant negative comments to staff and co-workers about me as follows: "the only reason she is here is because she came from the state, has a disability and is a tax break for the company". Negative statements by Traci Paraday (White) to staff and supervisor Paul Straznickas as follows: "I don't trust her" and I was regarded on all levels as incompetent and work was withheld from me. I was also subjected to constant negative statements by Alexis Martinez Romero (White) as: "I don't feel you can do this, and when I find something I feel you can do, I will let you know". On or about August 10, 2019, I complained to Mr.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 1/7/2020 *Date*     *Claudia Bell* *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 480-2020-00915 |

| **California Department Of Fair Employment & Housing** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

Rosado and Mr. Straznickas about being treated differently and about the hostile work environment, which I believe to be due to my race, color, age, and disability. On or about October 2, 2019, I wrote an email to Paul Straznickas asking him "why he treated me differently and showed great intolerance towards me", Paul never responded to my email. I complained to Mr. Rosado, Human Resources Manager on October 4th 2019 regarding information told to me from a co-worker (Brenda Cortez) how my skills and character were being slandered to the whole company by Traci Boyer (White). Mr. Rosada terminated my employment after I made this complaint on October 9, 2019.

No reason was given by management for the different terms and conditions of my employment and/or the hostile work environment. The reason given by Mr. Rosado for the discharge was for making two mistakes.

I believe I have been discriminated against due to my race, (Black) age, (69), and disability, record of being disabled, or being regarded as disabled, in retaliation for engaging in a protected activity, and in violation of the Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, as amended, and the Americans with Disability Act of 1990, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| *1/7/2020*    *Claudia Bell*<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

**Bob Rosado**

| | |
|---|---|
| **From:** | Claudia Bell |
| **Sent:** | Friday, October 04, 2019 3:14 PM |
| **To:** | Bob Rosado |
| **Subject:** | COMPLAINT |

Dear Human Resources,

I was informed yesterday by Ms. Brenda Cortez that Traci Boyer told a group of people while they were lunching together that I was "sent here from the State, that I have a disability and that I am just a tax break for OC405 and that is the only reason why I'm here".
I have noticed that the other employees that were very friendly to me has changed towards me. My own department treats me as if I have a mental problem and that I'm incapable of performing my duties here at OC405-Document Control.

I'm asking Human Resources to please do something. Why has my personnel information been breached?

Thank you.

*Claudia Bell* – MCAS
Data Management Assistant
*Microsoft Certified Application Specialist #7760369*

OC405
PARTNERS

3100 W. Lake Cener Dr. 2nd Floor
Santa Ana, CA 92704

1

# Bob Rosado

| | |
|---|---|
| **From:** | Claudia Bell |
| **Sent:** | Tuesday, October 08, 2019 8:10 AM |
| **To:** | Bob Rosado |
| **Subject:** | RE: COMPLAINT |

I had no idea I would be slandered, abused, discriminated against, treated like a child, treated as though I'm mentally ill, incapable, having work taken from me, not allowed to be inclusive in the workplace or the work or "workplace mobbed" because I came onboard as a "State Sponsored, on the Job Training Employee." I'm an OC405 Employee now aren't I? On-the-Job Training to me, means the job is going to train me do their work as they do it, it doesn't mean I don't have skills and education and lack qualifications. Perhaps my Resume needs to be revisited and my capabilities noted.

As of now, I feel highly humiliated. I'm embarrassed and ashamed of what's been done to my character and reputation and skill level by a co-worker and why and how is that any of her business even if it is an open policy that I was State Sponsored. I've never been told Traci Boyer is a supervisor. <u>Who told her this information and for what purposes?</u>

I would like to know what "disability" Traci Boyer told these people I have?

Furthermore, I would like to know if the Owners of this company are aware of the conduct and behaviors of their employees and if they are complicit in this activity and does it matter them to them if their workplace is dysfunctional in my opinion with run-away-racism? I use the word "racism" because if I had from the "State Sponsored" program as a "white woman", there would be no problem.

*Claudia Bell* – MCAS
Data Management Assistant
*Microsoft Certified Application Specialist #7760369*

3100 W. Lake Cener Dr. 2nd Floor
Santa Ana, CA 92704

**From:** Bob Rosado <Roberto.Rosado@oc405.com>
**Sent:** Friday, October 4, 2019 4:34 PM
**To:** Claudia Bell <Claudia.Bell@oc405.com>
**Subject:** RE: COMPLAINT

Hi Claudia, I will look into the matter immediately.  Please keep in my that you were hired under a on the job training program, which is a state sponsored public program for designed to provide employment opportunities.  I will looking to the referencing and particulars.

**From:** Claudia Bell <Claudia.Bell@oc405.com>
**Sent:** Friday, October 04, 2019 3:14 PM
**To:** Bob Rosado <Roberto.Rosado@oc405.com>
**Subject:** COMPLAINT

Dear Human Resources,

1

EXHIBIT 1.

Attached non-dated letter where EEOC found OC405 was in violation of Title I of the Americans with Disabilities Act of 1990, as amended (ADA) by co-mingling medical information with regular personnel information.

- Source FOIA – EEOC
  - 2 pages



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Los Angeles District Office**

255 E. Temple Street, 4ᵗʰ Floor
Los Angeles, CA  90012
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Los Angeles Direct Dial: (213) 785-3090
FAX (213) 894-1118
Website: www.eeoc.gov

EEOC Charging No. 480-2020-00915

Claudia E. Bell                                    Charging Party
840 W. La Jolla, Apt. 4d
Placentia, CA 92870


Clint Engleson, Esq.                               Respondent
c/o OC405 Partners
Procopio, Cory, Hargreaves & Savitch LLP
525 B Street, Suite 2200
San Diego, CA 92101


## LETTER OF DETERMINATION

I issue the following determination as to the merits of the charge.

Respondent is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000-e et. seq. ("Title VII"). Timeliness and all requirements for coverage have been met.

The Charging Party alleges that she was harassed, subjected to different terms and conditions of employment because of her race (Black), age (year of age 1951), and disability, in violation of Title VII, as amended, the Age Discrimination in Employment Act of 1967, as amended, and the Americans with Disabilities Act of 1990, as amended. Charging Party further alleges that she was discharged in retaliation for engaging in a protected activity, in violation of Title VII, Age Discrimination in Employment Act of 1967, and the Americans with Disabilities Act of 1990.

Respondent denies the allegations.

Examination of the evidence obtained in the Commission's investigation, including but not limited to, documents, testimony, and on-site inspection interviews, supports a finding that there is reasonable cause to believe that the Charging Party was subjected to harassment because of her disability and her race (Black), in violation of the Americans with Disabilities Act of 1990 and Title VII, and discharged in retaliation for participating in protected activity. The Commission's investigation also disclosed that the Respondent has violated the confidentiality requirements of Title I of the Americans with Disabilities Act of 1990, as amended (ADA), by co-mingling medical information with regular personnel information. In order to comply with the confidentiality requirements of the ADA, all medical information for current and former employees must be maintained in a separate medical file in a separate locked cabinet, apart from the location of

Claudia *E. Bell v. OC405 F    ners*
*Charge No.* 480-2020-00915

Page **2** of **2**

personnel files. The ADA's confidentiality obligation does not terminate once an employee is no longer employed by the employer. Therefore, this investigation revealed that the Respondent is in violation of the ADA.

The Commission makes no finding regarding the Charging Party's other allegations.

Respondent is reminded that Federal law prohibits retaliation against persons who have exercised their right to inquire or complain about matters they believe may violate the law. Discrimination against persons who have cooperated in EEOC investigations is also prohibited. These protections apply regardless of the EEOC's determination on the merits of the charge.
Upon finding that there is reason to believe that violations have occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation (i.e., settlement). Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter. If you wish to participate in conciliation, please email Investigator Lina G. Williams at lina.williams@eeoc.gov, within 10 calendar days from the date of this Letter of Determination.

When the Respondent declines to enter into conciliation discussions, or when the Commission's representative for any reason is unable to secure a settlement acceptable to the Commission, the Commission shall so inform the parties in writing and advise them of the court enforcement alternative available to the Charging Party, aggrieved persons and the Commission. The confidentiality provisions of the statute and Commission Regulations apply to information discussed or given during conciliation.

On Behalf of the Commission

_____
Date

Christine Park-Gonzalez, Acting District Director
Los Angeles District Office

- EXHIBIT 2.

Attached non-dated letter where EEOC found OC405 was in violation of the Charging Party was Retaliated against based on her race/Black/African American, Age (year of age 1951) and disability, in violation of Title VII, Age Discrimination in Employment Act of 1967, and the Americans with Disability Act of 1990.

-Source FOIA – EEOC

2 Pages



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Los Angeles District Office**

255 E. Temple Street, 4th Floor
Los Angeles, CA  90012
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Los Angeles Direct Dial: (213) 785-3090
FAX (213) 894-1118
Website: www.eeoc.gov

EEOC Charging No. 480-2020-00915

Claudia E. Bell                                          Charging Party
840 W. La Jolla, Apt. 4d
Placentia, CA 92870

Clint Engleson, Esq.                                    Respondent
c/o OC405 Partners
Procopio, Cory, Hargreaves & Savitch LLP
525 B Street, Suite 2200
San Diego, CA 92101

## <u>LETTER OF DETERMINATION</u>

I issue the following determination as to the merits of the charge.

Respondent is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000-e et. seq. ("Title VII"). Timeliness and all requirements for coverage have been met.

The Charging Party alleges that Respondent subjected her to discrimination because of her race/Black/African American, age (year of age 1951) and disability, in violation of Title VII, as amended, the Age Discrimination in Employment Act of 1967, as amended, and the Americans with Disability Act of 1990, as amended. Charging Party further alleges that she was subjected to disparate treatment, hostile work environment and was discharged in retaliation for engaging in protected activity by complaining about harassment and discrimination because of her race/Black/African American, age (year of age 1951) and disability, in violation of Title VII, Age Discrimination in Employment Act of 1967, and the Americans with Disability Act of 1990.

Respondent denies the allegations.

Examination of the evidence obtained in the Commission's investigation, including but not limited to, documents, testimony, and on-site inspection interviews, supports a finding that there is reasonable cause to believe that the Charging Party was retaliated against based on of her race/Black/African American, age (year of age 1951) and disability, in violation of Title VII, Age Discrimination in Employment Act of 1967, and the Americans with Disability Act of 1990.

The Commission makes no finding regarding the Charging Party's other allegations.

Claudia *E. Bell v. OC405 Partners*
*Charge No.* 480-2020-00915

Page **2** of **2**

Respondent is reminded that Federal law prohibits retaliation against persons who have exercised their right to inquire or complain about matters they believe may violate the law. Discrimination against persons who have cooperated in EEOC investigations is also prohibited. These protections apply regardless of the EEOC's determination on the merits of the charge.
Upon finding that there is reason to believe that violations have occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation (i.e., settlement). Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter.  If you wish to participate in conciliation, please email Investigator Lina G. Williams at lina.williams@eeoc.gov. within 10 calendar days from the date of this Letter of Determination.

When the Respondent declines to enter into conciliation discussions, or when the Commission's representative for any reason is unable to secure a settlement acceptable to the Commission, the Commission shall so inform the parties in writing and advise them of the court enforcement alternative available to the Charging Party, aggrieved persons and the Commission. The confidentiality provisions of the statute and Commission Regulations apply to information discussed or given during conciliation.

On Behalf of the Commission

_____                    _____
Date                                        Christine Park-Gonzalez, Acting District
                                            Director
                                            Los Angeles District Office

# EXHIBIT 3.

## EDUCATION:


MICROSOFT OFFICE SPECIALIST – Santa Ana College

Microsoft Certified Applications Specialist 2009-2011

JULY 2010

OFFICIAL MICROSOFT CERTIFICATION

Ybx6-kxH5

**Microsoft** | Learning



MICROSOFT CERTIFICATE OF EXCELLENCE

Microsoft Office Specialist

July 21, 2010

Claudia Elizabeth Bell

has successfully completed the requirements to be recognized as a Microsoft Office Specialist for

Office Word 2007

Office Word 2007

Microsoft Office Specialist



Steven A. Ballmer
Chief Executive Officer
Microsoft Corporation



Dear Claudia Elizabeth Bell,

YOUR MICROSOFT CERTIFICATION ID IS: 7706369
YOUR TEMPORARY PASSWORD IS: C2EDE1A9-F515-46AA-808B-9704D433AC6E

Congratulations on joining the Microsoft Office Specialist certification program. You have achieved a
**Microsoft® Office Specialist** credential and have joined a global community of distinguished achievers. This
Microsoft credential tells the world you have demonstrated proficiency in 2007 Microsoft Office.

As part of your certification benefits, you can now access a private site that includes a wealth of information and
resources. Designed with your feedback in mind, the site will enable you to create and download customized logos,
view and share your transcript, and plan to achieve future certifications. It's very important to follow these steps to
fully recognize all the benefits of your new Microsoft Certification:

**1. ACCESS THE MCP MEMBER SITE WITHIN 90 DAYS OF YOUR EXAM DATE.**
To access the MCP member site (https://mcp.microsoft.com/mcp/default.mspx), you will need your Windows Live ID,
your Microsoft Certification ID (above), and a temporary access code (above). If you need assistance, contact your
Regional Service Center (http://www.microsoft.com/learning/support/worldsites.asp).

**2. CONFIRM YOUR PROFILE INFORMATION.**
Log in to the Microsoft Certification Web site (https://mcp.microsoft.com/mos/default.mspx), select
*VIEW MY PROFILE* from the left navigation and confirm that your e-mail address and profile is correct so we can
reach you with benefits, offers, and program news.

**3. EXPLORE THE COMMUNITY!**
You are now eligible to access a wealth of information and resources designed to help you stay
current on Microsoft technologies, connect with peers, and plan further training.
Visit http://www.microsoft.com/learning/en/us/certification/mcp-member-sites.aspx to get started.

We hope your achievement of Microsoft Office Specialist certification will inspire you to continue expanding your
computing skills and to attain additional certifications. Microsoft Office Specialist certifications are available for:

- Office Word 2007
- Office Excel® 2007
- Office PowerPoint® 2007
- Office Outlook® 2007
- Office Access® 2007
- Windows Vista®

For a complete listing of Microsoft Office Specialist certifications, learning materials and program
details, please visit http://www.microsoft.com/learning/en/us/certification/mos.aspx.

Again, congratulations on your achievement! We wish you success in all your professional and academic endeavors.

Best Regards,

Steven A. Ballmer
Chief Executive Officer
Microsoft Corporation

Microsoft®
.Office
Specialist

EXHIBIT 4.

ON-THE-JOB TRAINING AGREEMENT

American Recovery and Reinvestment Act

Department of Rehabilitation (DOR)

## ON-THE-JOB TRAINING AGREEMENT
### American Recovery and Reinvestment Act

State of California
Department of Rehabilitation
222 S. Harbor Blvd, Suite 300
Anaheim, CA 92804
(714) 991-0814

Employer/Trainer
OC 405 Partners
3100 W. Lake Center Dr.
Santa Ana, CA 92704
(858) 251-2248 (office)
(714) 944-7375 (cell)

The California Department of Rehabilitation hereinafter called "The Department," and OC 405 Partners, The Trainer, agrees to enter into an On-the-Job Training (OJT) Agreement to provide on-the-job training to Claudia Bell, the Trainee, in the occupation of Data Management Assistant Trainee. The Trainer, for and in consideration of the terms set forth in this agreement, and in accordance with all applicable laws and regulations governing employment, agrees to provide on-the-job training to the Trainee. In consideration of the training services rendered to the Trainee, the Department agrees to pay the Trainer a training fee as set forth in this agreement. This OJT agreement may be modified or terminated at any time.

The training period shall be from **March 11, 2019 to May 3, 2019.**

Hours of work shall be 8:30 AM till 5:30 PM 5 days a week. Trainee shall have a ½ hour lunch and two 15-minute breaks during the day.

Instruction and supervision shall be given by Bob Rosado, Account Manager.

The Trainer agrees to provide instruction to the Trainee on the following   specific work skills and essential functions, technical knowledge, and/or operation of tools/machines, if any:
1) 1st Month:         Advanced use of Word, Excel, Electronic filing and data management.

2) 2nd Month:         Hands on day to day practice with both Aconex and Sharepoint.

The Trainer agrees to pay the Trainee the following wages during training at the prevailing rate paid other employees with similar knowledge and skills:
**$15.00 per hour, 40 hours per week, for 8 weeks.**

The Trainer, OC 405 Partners, understands that an employee/employer relationship exists and the Trainer is responsible for the following:
1. Application and required employer contribution such as unemployment insurance benefits and social security.
2. Withholding from the trainee's earnings applicable and required deductions such as state and federal income taxes, Social Security, and State Disability Insurance.
3. Employ the Trainee upon completion of training.

OC405_00024

4. Inform the Department of any problem that may arise and agrees to submit monthly progress reports on the last day of each month with his/her invoice.

The Department agrees to pay the Trainer a training fee per month or a prorated portion thereof, as follows:
**Department of Rehabilitation Cost:**
   **8 weeks..... at 100% = $4800.00 maximum**


The Department is responsible for the full amount of any additional workers' compensation insurance premium expenses incurred by the Trainer during the Trainee's training period.

**The Department agrees to pay the trainer a training fee per month or prorated portion thereof as follows:**
   **1) First Month   (100%)   =   $2400.00**
   **2) Second Month (100%)   =   $2400.00**

Trainee Signature:                                          Date:

DOR Counselor Signature: _Lurelle Menesperman_          Date: 2/27/2019

Trainer/Employer Signature:                           Date: 3/4/19
   _Bob Rosado_

Team Manager Signature:                               Date: 2/27/19

Copies to:     (1) Trainer/Employer
               (2) Trainee
               (3) DOR Workforce Development
               (4) Consumer Case File

OC405_00025

10

EXHIBIT 5.

PROGRESS REPORTS FROM OC405 PARTNERS
(DOCUMENT CONTROL)

TO

STATE OF CALIFORNIA – DEPATMENT OF
REHABILITATION (DOR)

Six Pages

State of California - Department of Rehabilitation
**REPORT OF PROGRESS IN TRAINING**
DR 226 (Rev. 05/88) Computer Generated  Page 1 of 2

NOTE:  <u>Bills cannot be processed for payment unless accompanied by a complete report.</u>

*-- SEE PAGE 2 FOR LEGAL NOTICES --*

Month ending    *3/2019*

DR Counselor

1.  Name of Trainee   *CLAUDIA BELL*

2.  Calendar School Days Absent (Please (X) out dates absent): If no absences, check here  ☒
    1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31

3.  Reason(s) for absence(s)

4.  Did trainee notify you of his absence(s)    ☐ Yes    ☐ No   Comments

5.  Number of hours of instruction given this month: *120* hours  *3 WEEKS*

6.  Subjects or operations this month -- with grades (A for excellent; B for good; C for fair; D for poor; F for failing -- Indicate words per minute if typing or shorthand)

| Subjects or operations | Grade | Subjects or operations | Grade |
|---|---|---|---|
| *MS SHAREPOINT FILE UPLOAD* | | | |
| *MS SHAREPOINT TAXONOMY* | | | |
| *MS SHAREPOINT FILE QC* | | | |

7.  Cooperation and attitude in training *(please comment):*
    *BOTH VERY GOOD*

8.  Difficulties with training course *(please comment):*

9.  In your judgment, does trainee have the talent, personality, educational and other qualifications necessary to succeed in this type of work?   ☒ Yes   ☐ No   ☐ Questionable.
    If not or questionable, explain:

10. How much more time will trainee require (approximately) to complete training?  *ON GOING*

11. How much are you paying the trainee in wages?  */5 /Hr*

12. Recommendations for improving performance and other comments. *(Use reverse side if more space is needed):*

13. Department use only:

    ┌─────────────────────────────────────────────────────┐
    │ Business Enterprise Officer -- Comments:            │
    │                                                     │
    │                                                     │
    └─────────────────────────────────────────────────────┘

    Training Agency  *OC4OS Partner*
    Address  *3100 W. Lake Center Drive, Santa Ana, CA. 92704*
    Phone  *858 - 251 - 2202*
    [Signed]  _____
              Person in charge of training

State of California - Department of Rehabilitation
**REPORT OF PROGRESS IN TRAINING**
DR 226 (Rev. 05/88) Computer Generated  Page 1 of 2

NOTE:  <u>Bills cannot be processed for payment unless accompanied by a complete report.</u>

*– SEE PAGE 2 FOR
LEGAL NOTICES –*

1.  Name of Trainee  Claudia Bell

Month ending

DR Counselor

2.  Calendar School Days Absent (Please (X) out dates absent): If no absences, check here  ☒
    1  2  3  4  5  6  7  8  9  10  11  12  13  14  15  16  17  18  19  20  21  22  23  24  25  26  27  28  29  30  31

3.  Reason(s) for absence(s)

4.  Did trainee notify you of his absence(s)  ☒ Yes   ☐ No   Comments

5.  *Number of hours of instruction given this month:* 160.00 *hours*

6.  Subjects or operations this month -- with grades (A for excellent; B for good; C for fair; D for poor; F for failing -- Indicate words per minute if typing or shorthand)

| *Subjects or operations* | *Grade* | *Subjects or operations* | *Grade* |
|---|---|---|---|
| | | | |

7.  Cooperation and attitude in training *(please comment)*:
    Very good.

8.  Difficulties with training course *(please comment)*:
    None

9.  In your judgment, does trainee have the talent, personality, educational and other qualifications necessary to succeed in this type of work?   ☒ Yes   ☐ No   ☐ Questionable
    If not or questionable, explain:

10.  How much more time will trainee require (approximately) to complete training? 0HR

11.  How much are you paying the trainee in wages? $15/HR

12.  Recommendations for improving performance and other comments.*(Use reverse side if more space is needed)*:
     We have hired Claudia FT.

13.  Department use only:

     Business Enterprise Officer -- Comments:

Training Agency  *H.R.*
Address

Phone
[Signed] _____  (714) 944-7375
              *Person in charge of training*

OC405_00033

State of California - Department of Rehabilitation
**REPORT OF PROGRESS IN TRAINING**
DR 226 (Rev. 05/88) Computer Generated  Page 1 of 2

NOTE:  Bills cannot be processed for payment unless accompanied by a complete report.

*-- SEE PAGE 2 FOR*
*LEGAL NOTICES --*

Month ending 4/2019

DR Counselor

1. Name of Trainee Claudia Bell
2. Calendar School Days Absent (Please (X) out dates absent): If no absences, check here ☒
   1  2  3  4  5  6  7  8  9  10  11  12  13  14  15  16  17  18  19  20  21  22  23  24  25  26  27  28  29  30  31
3. Reason(s) for absence(s)
4. Did trainee notify you of his absence(s)    ☒ Yes    ☐ No    Comments

5. Number of hours of instruction given this month: 160.00 hours  *4 weeks*
6. Subjects or operations this month -- with grades (A for excellent; B for good; C for fair; D for poor; F for failing -- indicate words per minute if typing or shorthand)

| *Subjects or operations* | *Grade* | *Subjects or operations* | *Grade* |
|---|---|---|---|
|  |  |  |  |

7. Cooperation and attitude in training *(please comment):*
   Very good.

8. Difficulties with training course *(please comment):*
   None

9. In your judgment, does trainee have the talent, personality, educational and other qualifications necessary to succeed in this type of work?    ☒ Yes    ☐ No    ☐ Questionable
   If not or questionable, explain:

10. How much more time will trainee require (approximately) to complete training? 0HR
11. How much are you paying the trainee in wages? $15/HR
12. Recommendations for improving performance and other comments.*(Use reverse side if more space is needed):*
    Plan to hire Claudia

13. Department use only:

> Business Enterprise Officer — Comments:

Training Agency H.R., OC 405 Partners
Address 3100 W. Lake Center Drive
Santa Ana, CA. 92704
Phone
[Signed] _____ (714) 944-7375
*Person in charge of training*

State of California - Department of Rehabilitation
**REPORT OF PROGRESS IN TRAINING**
DR 226 (Rev. 05/88) Computer Generated Page 1 of 2

NOTE:   ~~Bills cannot be processed for payment unless accompanied by a complete report.~~

*– SEE PAGE 2 FOR LEGAL NOTICES –*

Month ending _5/2019_

DR Counselor

1. Name of Trainee  Claudia Bell
2. Calendar School Days Absent (Please (X) out dates absent): If no absences, check here [X]
   1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31
3. Reason(s) for absence(s)
4. Did trainee notify you of his absence(s)   [X] Yes   [ ] No   Comments

5. Number of hours of instruction given this month:  _40_  hours  _1 week_
6. Subjects or operations this month – with grades (A for excellent; B for good; C for fair; D for poor; F for failing – indicate words per minute if typing or shorthand)
   *Subjects or operations*                 Grade     *Subjects or operations*                 Grade

7. Cooperation and attitude in training *(please comment)*:
   Very good.

8. Difficulties with training course *(please comment)*:
   None

9. In your judgment, does trainee have the talent, personality, educational and other qualifications necessary to succeed in this type of work?   [X] Yes   [ ] No   [ ] Questionable
   If not or questionable, explain:

10. How much more time will trainee require (approximately) to complete training? 0HR
11. How much are you paying the trainee in wages? $15/HR
12. Recommendations for improving performance and other comments. *(Use reverse side if more space is needed)*:
    We have hired Claudia FT.

13. Department use only:
    ┌─────────────────────────────────────────────────────────────────┐
    │ Business Enterprise Officer – Comments:                           │
    │                                                                   │
    │                                                                   │
    └─────────────────────────────────────────────────────────────────┘

    Training Agency  _H.R. OC 405 Partners_
    Address _3100 W Lake Center Drive, Santa Ana, CA 92704_
    Phone
    [Signed] _____  (714) 944-7375
                                    *Person in charge of training*

### RE: Progress Report Documentation OC405



From:   Hendricks, Cassandra@DOR (Cassandra.Hendricks@dor.ca.gov)

To:     perfect992@yahoo.com

Date:   Monday, October 21, 2019, 11:53 AM PDT

**Hi Claudia,**

Per your request, here are Progress Reports I have on file. Here is an email below as well as some attachments. I will forward this information as well.

**From:** Paul Straznickas <paul.straznickas@oc405.com>
**Sent:** Friday, April 12, 2019 3:47 PM
**To:** Bob Rosado <r.rosado@oc405.com>; Hendricks, Cassandra@DOR <Cassandra.Hendricks@dor.ca.gov>
**Cc:** Freddy Fajardo <f.fajardo@oc405.com>
**Subject:** RE: Ms. C Bell progress report and hours for reimbursement

Hello Cassandra,

Claudia is working out very well. Attendance and work attitude is great. On her fourth week she has accomplished all the initial task training.

- SharePoint document best practices
- QC 'ing the incoming DRAFT Inspection documents
- Naming and organizing documents.
- Moving the documents to the review area.
- After the documents approved she is flattening/locking the PDF and applying additional SharePoint meta data
- Sending out to all OC405 personnel a daily digest of the project's document activity.
- Providing occasional coverage for the front entrance reception

Thanks, ☺

Paul Straznickas

(714) 944-7400 *mobile*

p.straznickas@oc405.com

State of California - Department of Rehabilitation
**REPORT OF PROGRESS IN TRAINING**
DR 226 (Rev. 05/88) Computer Generated  Page 2 of 2

## LEGAL NOTICES

The Department of Rehabilitation affirmatively supports all federal and state
civil rights laws and will not knowingly do business with any agency or
entity which discriminates on the basis of ethnic group identification,
national origin, race, color, creed, religion, sex, age, sexual orientation,
physical or mental disability, medical condition, marital status or ancestry.

Under State law and departmental regulations, all information that you
supply to the Department of Rehabilitation is maintained in files that are
subject to inspection by the enclosed named applicant/client.

EXHIBIT 6.

LEAP CERTIFICATION FROM DEPARTMENT OF
REHABILITATION

2 PAGES

**LEAP CERTIFICATION**

DR 10 (Rev. 01/13)

*IMPORTANT:  See instructions on Page 2*

RECEIVED

---

Applicant's Name  (Please Print/Type)

Claudia E. Bell

---

This is to certify that the above-named person qualifies for participation in the Limited Examination and Appointment Program.

I certify this individual as (check one):

☒ Having a physical or mental impairment or medical condition which limits one or more major life activities of such individual; or

☐ Having a record or history of such impairment or condition; or

☐ Being regarded as having such an impairment or condition.

Applicant understands that information regarding his/her disability and Social Security number will be shared with the California Department of Human Resources for purposes of program eligibility and affirmative action data collection.

| | |
|---|---|
| | Certifier's Name (Please Print/Type) <br> ERIC I. ANDERSON |
| Applicant's Social Security Number <br> ██████8604 | Certifier's Title/Name of Agency <br> SENIOR VOC REHAB COUNS/Dept. of Rehabilitation |
| Applicant's Address <br> PO Box 1341 <br> Garden Grove, CA 92842 | Certifier's Address <br> 790 THE CITY DRIVE SOUTH <br> SUITE 110 <br> ORANGE, CA 92868 |
| Applicant's Telephone Number <br> (951) 284-8032 | Certifier's Telephone Number <br> (714) 662-6040 |
| Applicant's Signature        Date Signed <br> *Claudia Bell*  11/30/16 | Certifier's Signature        Date Signed <br> *Eric Anderson*  11/21/16 |

APPLICANT AND DOR: SIGN IN BLUE INK ONLY

DOR: PROVIDE A **COPY** TO THE INDIVIDUAL. STAMP **ORIGINAL** WITH DATE STAMP PRIOR TO MAILING TO THE CALIFORNIA DEPARTMENT OF HUMAN RESOURCES.

**LEAP CERTIFICATION**
DR 10 (Rev. 05/13)

## STEPS TO FOLLOW ONCE YOU RECEIVE YOUR LEAP CERTIFICATE

**Step 1 DOR STAFF WILL MAIL THE <u>ORIGINAL</u> OF THE CERTIFICATE TO:**

California Department of Human Resources
Examination Services Program
1515 S Street, North Building, Room 400
Sacramento, CA 95811

- The DOR will provide a **copy** of the certificate to you for your records.
- California Department of Human Resources (CalHR) will provide notification to you after they receive your certificate and it is entered into their database, usually within ten (10) business days.

**Step 2 RESEARCH LEAP EXAMS/RECRUITMENTS:**

- Apply for specific LEAP examinations, available at
- Enter LEAP in the Job Title box and click Search to find the title of the examination you are interested in and determine if you are qualified to apply.
- LEAP exam announcements may also be available at the Employment Development Department, Department of Rehabilitation and other organizations serving people with disabilities.

**Step 3 EXAM APPLICATIONS:**

- Read the exam announcement to find out the scope of the classification, how to apply, and all other pertinent information.
- Apply online via the Internet or by mail, according to the instructions on the exam announcement.

**Step 4 LEAP EXAMINATION – Part 1: (Job Readiness Evaluation):** As you complete this portion, your education, experience and personal qualifications will be evaluated through an examination process to determine your readiness to work.

**Step 5 EXAMINATION RESULTS:** When you are successful in Part 1, your name will be placed on a referral list. Anyone may be appointed from the referral list (regardless of ranking) to participate in Part 2 of the LEAP Examination (Step 7 below).

**Step 6 JOB APPLICATION AND INTERVIEW FOR ACTUAL VACANT POSITION:**

- Search for vacant positions with the same title of the classification(s) for which you passed Part 1 at www.jobs.ca.gov and follow the instructions on the job vacancy announcements.
- Apply for as many positions that interest you.
- **<u>Do not</u>** send a copy of your LEAP Certification Form.
- State departments may also send you Employment Inquiries asking if you are interested in being considered for their vacant positions.
- When you are invited for a hiring interview, you will have the opportunity to convince a department that you are the best person for that job.

**Step 7 LEAP EXAMINATION - Part 2 (Job Examination Period):**

- If you are hired, it will be on a temporary basis while you serve a two (2) to four (4) month on-the-job performance evaluation.
- If you meet performance standards during the evaluation period, you pass your examination.

**For name change, you must write to CalHR at the address shown in Step 1 above. All other updates to your personal information can be made through My Profile at www.jobs.ca.gov.**

**For questions on the Online examination system, call Toll Free (866) 844-8671, option 3 voice (CA Relay Service 7-1-1) or e-mail JobExamCerts@calhr.ca.gov**

**For general LEAP information, visit CalHR's website at http://jobs.ca.gov/Job/Leap. To view/download LEAP Brochures, visit the CalHR's website at www.jobs.ca.gov.**

EXHIBIT 7.

DISCHARGE – OC405 PARTNERS October 9, 2019

TWO PAGES



OC 405 Partners JV
3100 Lake Center Drive
Santa Ana, CA 92704
858-251-2200

## Notice to Employee as to Change in Relationship
(Termination Notice Pursuant to Provision of Section 1089 of the California Unemployment Insurance Code)

**Employee Name:** Claudia Bell      **Date: 10/09/2019**

**Social Security Number:**

### Change In Relationship

Your employment status has changed, effective:

- \_\_\_\_ Voluntary quit
- \_\_\_\_ Layoff
- \_\_\_\_ Leave of absence
- **X**   **Discharge:**
- \_\_\_\_ Refusal to accept available work
- \_\_\_\_ Change in status from employee to independent contractor

Quality of Work: Multiple and repetitive issues specific to primary duties and responsibilities having an adverse impact on the project.

As a result, placing the employer is a position of non-compliance with respects to contractual, State, and Federal obligations.

## OC405 Partners Representative

First Name: BOB      Last Name: ROSADO

Signature            Date      10/9/2019

### Notice Acknowledgement

I received a copy of Notice to Employee as to Change in Relationship on: _____

*Claudia Bell*

Print Name: Claudia Bell

*Claudia Bell*      10/9/19

Signature      Date: 10/09/2019

CI

Revised 06/2013



**OC 405 PARTNERS**

## ACKNOWLEDGEMENT OF RECEIPT WARNING

*By signing this form, you confirm that you understand the information in this warning. You also confirm that you and your manager have discussed the warning and a plan for improvement. Signing this form does not necessarily indicate that you agree with this warning.*

Employee Signature _____ Date 10/9/19

Manager Signature _____ Date 10/9/2019

Witness Signature _____ Date 10/9/19

I Know it needed Retraction
I had to do this with Cassidy
I am not Proficient in the
Retraction process.

Most of the Letter Cassidy did train me on.
however I would look in Acord, Review
files that were likewise and follow those

This is retaliation and its unnecessary

got this signature page
From Previou Attorney
4-2020

OC405_00003

EXHIBIT 8.

EMPLOYEE DISCIPLINARY ACTION AFTER
TERMINATION

DATED OCTOBER 2, 2019

Received in Position Statement from OC405 Partners Attorney

PORCOPIO LAW FIRM

FALSE DOCUMENTATION



*After I was Terminated/Fired*



# EMPLOYEE DISCIPLINARY NOTICE

## EMPLOYEE INFORMATION

Date: 10/2/19

Company Name: OC405 Partners JV                    Client ID: _____

Employee Name: Claudia Bell          Employee ID: _____    Job Title: Data Management Assistant

Department: Document Control      Manager: Traci Paraday       Supervisor: Paul Straznickas

## VIOLATION

- ☐ Tardiness / Leaving Work Early
- ☐ Violation of Safety Rules
- ☐ Violation of Company Policies
- ☐ Absenteeism
- ☐ Misconduct
- ☐ Insubordination
- ☑ Other — OC405-OCTA letter incorrectly issued

## ACTION TAKEN

- ☑ Verbal Warning
- ☑ Written Warning
- ☐ Final Warning
- ☐ Paid
- ☐ Suspension          # of Days Suspended _____ Start Date: _____    End Date: _____    ☐ Not Paid

## DETAILS

Time: _____    Place: OC405 Office          Detail of Infraction: OC405-OCTA letter not issued to correct parties and was delayed six (6) weeks

08/21/19 - Issued OC405-OCTA-01567 incorrectly which did not make it to the applicable parties.  This was a letter regarding Design review delays Retaining wall 843 which never made it to OCTA causing a potential claim issue on behalf of OC405 for delaying the transfer of vital information to OCTA from Designer.
10/01/19 - This was brought to the attention of Azzam Saad and Document control by the Designer and PMC that the letter had never made it down. This has resulted in a OC405 delay in the timely PMC notification of PCO.

**Plan for Improvement:**

Revisit the steps and instructions created within notes taken during training to assure that the addressees are noted correctly.
Take care to pay close attention to all communications/letters are directed and distributed to the appropriate parties.
Double check before sending that all the correct parties are addressed.

**Recommended Action:**

Meet with Claudia to discuss the hardships this error has created and review work product.
Review the training notes for the documents in question and assure complete accuracy to avoid future repeated errors.

**Consequence of Further Infractions:**



## EMPLOYEE STATEMENT

- ☐ I AGREE with Supervisor's Statement
- ☑ I DO NOT AGREE with Supervisor's Statement

22

EXHIBIT 9.

STOP WORK October 2, 2019

Two transmittal sheets shown

Does not affect the actual document

Also given at termination on 10/9/2019

**Claudia Bell**

| | |
|---|---|
| **From:** | Paul Straznickas |
| **Sent:** | Wednesday, October 2, 2019 3:57 PM |
| **To:** | Claudia Bell; Bob Rosado |
| **Subject:** | Aconex - PMC and DJV Letters - Stop Work on Sending All Letters |

Hello Claudia,

Please immediately stop sending letters to the Designer and/or PMC/OCTA via Aconex. I have concerns about your quality of work.

There have been too many errors. The Owner/PMC Doc Control has informed us of 2 recent errors causing re-work and has asked us to quickly correct the issues. (See the 3 screen captures below for the 2 most recent examples)

[Extra space in the Letter Title and Document name]



| MAIL TYPE | MAIL NUMBER | REFERENCE NUMBER |
|---|---|---|
| Transmittal | OC405-TRN-013207 | OC405-TRN-013207 |

## OC405-OCTA-01669_Subcontracts Executed in September 2019

| From | Claudia Bell - OC 405 Partners JV |
|---|---|
| ▶ To (4) | Mr Ashish Sharma - Parsons (+3 more...) |
| ▶ Cc (11) | Traci Paraday - OC 405 Partners JV (+10 more...) |
| Sent | Monday, September 30, 2019 9:19:16 AM PDT (GMT -7:00) |
| Reason | Issued for Use |
| Status | ⊘ Closed-Out |

∨ DETAILS

| Transmittal Type | Letter |
|---|---|

∨ 𝒪 DOCUMENT ATTACHMENTS (1)

| Download ∨ | Actions ∨ | View File Properties | Start a Workflow |
|---|---|---|---|

(0 selected)

| ☐ | File | Document No | Revision | Revision Date | Title | Status |
|---|---|---|---|---|---|---|
| ☐ | 📄 ⬍ | OC405-OCTA-01669 | 001 | 9/30/19 | Subcontracts Executed in September 2019 | Final |

∨ ATTRIBUTES

| Attribute 1 | Contract Management |
|---|---|

∨ MESSAGE

For your use; please see the following:

*OC405-OCTA-01669_20190930_Rev001_Subcontracts Executed in September 2019*



**Claudia Bell**

Data Management Assistant

C.Bell@oc405.com

|OC405|

[Sending a Word Document instead of the long required PDF format, mentioning a ZIP file which was not included]

2

| MAIL TYPE | MAIL NUMBER | REFERENCE NUMBER |
|---|---|---|
| Transmittal | OC405-TRN-013287 | OC405-TRN-013287 |

## OC405-OCTA-01674_PCO 13 – Depth to Span Ratio Additional Information re Cost and Schedule Impacts

| From | | Ms Claudia Bell - OC 405 Partners JV |
|---|---|---|
| ▶ To (4) | | Mr Ashish Sharma - Parsons (+3 more...) |
| ▶ Cc (20) | | Mr Richard Hebert - OC 405 Partners JV (+19 more...) |
| Sent | | Wednesday, October 2, 2019 2:27:24 PM PDT (GMT -07:00) |
| Reason | | Issued for Use |
| Status | | ⊘ Closed-Out |

∨ DETAILS

Transmittal Type        Letter

∨ 𝒮 DOCUMENT ATTACHMENTS (1)

Download ∨    Actions ∨    View File Properties    Start a Workflow

(0 selected)

| ☐ | File | Document No | Revision | Revision Date | Title | Status |
|---|---|---|---|---|---|---|
| ☐ | | OC405-OCTA-01674 | 001 | 10/2/19 | PCO 13 – Depth to Span Ratio Additional Information re Cost and Schedule Impacts | Final |

∨ ATTRIBUTES

Attribute 1        Contract Management

∨ MESSAGE

For your use; please see the following:

*OC405-OCTA-01674_20191001_Rev001_PCO 13 – Depth to Span Ratio Additional Information re Cost and Schedule Impacts*

**Claudia Bell**

[PMC Owner request to fix the above letter]

*[handwritten]* Owners dont intervene Need to show Email

*[handwritten]* Just Needed to ~~Pins~~ Resend w/ PDF Version Document Control did this and more all day.



OC405-OCTA-01674_PCO 13 – Depth to S...
TRANSMITTAL

██████a Bell                                    2:27 PM
OC 405 PARTNERS JV                      OC405-TRN-013287
2  24  1  ⊘ Closed-Out

Ashish Sharma                                3:13 PM
PARSONS                                  PAR-INFML-010584
2  8

| MAIL TYPE | MAIL NUMBER |
|---|---|
| Informal Mail | PAR-INFML-010584 |

Re: OC405-OCTA-01674_PCO 13 – Depth to Span Ratio Ad
Schedule Impacts

| From | Mr Ashish Sharma - Parsons |
|---|---|
| ▸ To (5) | Traci Paraday - OC 405 Partners JV (+4 more...) |
| ▸ Cc (3) | Leah Malloff - Parsons (+2 more...) |
| Sent | Wednesday, October 2, 2019 3:13:54 PM PDT (GMT · |
| Status | N/A |

⌄ ATTRIBUTES

| Attribute 1 | Contract Management |
|---|---|

⌄ MESSAGE

Paul

This letter needs to be revised. The attachments are missing and it has been se
inserted to.

Pls edit and resend.

Ashish

Sent: 30/2/19 2 27:24 PM PDT (GMT -07:00)
To: Leah Malloff, Dale Sandlin, Ashish Sharma, Maria Susaeov
Cc: Aymani Abdellam, Wahed Abraham, Claudia Bell, Traci Boyer, Cassidy Browning, Lawrence Damone, Jamis
Alex Hedyn, Sean Moghimi, Germaine Neumann-Chau, Ryan Nguyen, Sep Na, Traci Paraday, Azzett Saad, P
Mail Number: OC405-TRN-013287

Appreciate your cooperation in this.

**Paul Straznickas**
(714) 944-7400 *mobile*
p.straznickas@oc405.com

EXHIBIT 10.

EMAIL FROM Paul Straznickas 03/29/2019

TRAINING REQUEST to Document Team

**Claudia Bell**

| | |
|---|---|
| **From:** | Paul Straznickas |
| **Sent:** | Friday, March 29, 2019 4:43 PM |
| **To:** | Claudia Bell |
| **Cc:** | Traci Boyer; Traci Paraday; Alexis Martinez; Chelsea Cadenas |
| **Subject:** | Monday - Tuesday |

Hello Claudia,

Monday-Tuesday AM   Chelsea – Downstairs  Aconex Daily Digest Training

GSO Package Training

Alexis – Aconex Construction Submittal (+ Daily Digest assist)

Traci Paraday – GSO assist boxing

Cassidy – Planning on moving/tagging other folders/items to SharePoint SR.

OneDrive – Aesco   DIR/MOT/FT/CQP
Flatten/OCR
Tags on SharePoint SR (Unit ID,….)


If you need anything please text me.
See you Wednesday.

Thanks,



Paul Straznickas
OC405 Partners JV
(714) 944-7400 *mobile*
p.straznickas@oc405.com

EXHIBIT 11.

EMAIL FROM TRACI PARADAY ON 9/27/2019

To CASSIDY BROWNING

RE: TRAINING

Document falsified and used as Pretext of Disciplinary Action
and termination of employment for Claudia Bell

*Pretext*

**Claudia Bell**

| | |
|---|---|
| **From:** | Traci Paraday |
| **Sent:** | Friday, September 27, 2019 1:58 PM |
| **To:** | Cassidy Browning; Claudia Bell |
| **Subject:** | RE: Training on Outgoing Letters and use of Sharepoint Jr. |
| **Attachments:** | OC405 Doc Control Sharepoint Jr Concerns_20190927.pdf |

Ladies,
I have met with Claudia to review the items found in Sharepoint Jr. and we successfully verified the reasons for the additional folders and mix matched letters and attachments.
Collectively we resolved the issues and deleted the duplicated folders and additional training on letters was deemed not necessary at this time.
Thank you for your willingness to assist in a training refresher if needed.

Claudia and I discussed the need to create a typed up copy of all training notes taken so that they can be built upon and added to the SOP in process.
Claudia will provide electronic WORD.doc copies of her notes for each training to date.

Thanks again ladies for your participation.

Regards,
*Traci Paraday*

*the Directory*

**From:** Traci Paraday
**Sent:** Friday, September 27, 2019 12:50 PM
**To:** Cassidy Browning <Cassidy.Browning@oc405.com>; Claudia Bell <Claudia.Bell@oc405.com>
**Subject:** Training on Outgoing Letters and use of Sharepoint Jr.

Good morning Cassidy,

Do you happen to have time in your day to schedule a refresher training for outgoing letters to review with Claudia?

I was in Sharepoint Jr. this morning and noticed some items that were concerning and felt a refresher training may be of value.

If your schedule permits, could you both go over the following:

- How to generate an outgoing letter to OCTA
- How and where to store the outgoing letter to OCTA
- How to process send the letter in Aconex
- How to use the correspondence folder in Sharepoint Jr.

Repeat for letters that are OC405 to PI405 as the issues were duplicated.

I have attached screen shots and notes to help point out my findings that were concerning.

If your schedule does not permit, please let me know and I will carve out some time to host the training myself.

1

Also as a reminder, once training is completed a DCITR form needs to be completed.  I attached the previous copies for use.


Thank you for your time and support.

Thank you

Traci Paraday


Claudia –
Upon each training session please type up a word document made up of your step by step notes so it can be used for the (SOP) Standard Operating Procedure we are putting together at the request of management.
Once you have created the word doc of instructions please send to me and I will review and finalize into a procedure to add to the Training manual.
Thank you

Exhibit 12.

COMPUTER TAMPERING 08/29/2019

Plaintiff first saw this message on her computer 08/20/2019

Yahoo Mail - (No Subject)

(No Subject)

From:  Claudia E. Bell (perfect992@yahoo.com)

To:  c.bell@oc405.com

Date:  Thursday, August 29, 2019, 08:21 AM PDT



Sent from Yahoo Mail on Android

*Someone signed on my computer*

Exhibit 13.

EMAILS Plaintiff sent to Recruiter, Cassandra Hendricks at The Department of Rehabilitation (DOR)

Concerning harassment, discrimination and hostility and training at OC405 PARTNERS

July 13, 2019, and July 15, 2019- August 12, 2019

6 PAGES

Hi Claudia

From:  Hendricks, Cassandra@DOR (cassandra.hendricks@dor.ca.gov)

To:     perfect992@yahoo.com

Cc:     claudia_bell51@yahoo.com

Date:  Monday, August 12, 2019, 11:35 AM PDT

Hi Claudia,

I received your text indicating that you sent a letter to Bob in HR about what you are experiencing. I am sorry that you are dealing with this. You do have to advocate for yourself. There is no point in suffering in silence. This behavior has to be brought to light. I certainly hope they take things seriously. At this point, I would think they would. It is now in writing and that usually will catch people's attention. Don't be afraid, you did the right thing!

At some point, they'll have to sit down with you and talk a bit. Please let me know how that goes and if you would like me to speak with HR or your manager. Lastly, you're never bothering me at all. My job is to assist you with making a successful transition into employment. Issues that affect your health and exacerbate your disabilities' are issues we take seriously. Please let me know if you would like me to assist in any other way.

Best,

*Cassandra Hendricks*, Business Specialist

790 The City Drive South, Suite 110

Orange, CA 92868

(714) 662-6037 (desk)

Cassandra.hendricks@dor.ca.gov

OC405

From: Claudia E. Bell (perfect992@yahoo.com)

To: cassandra.hendricks@dor.ca.gov

Date: Saturday, July 13, 2019, 11:02 AM PDT

Hello Cassandra,

I hope all is well with you and your daughter is recovering.

This is a CONFIDENTIAL email.

I never asked this question. After I was hired on at OC405, was I supposed to do a 90 days and then become a permanent hire? If so, then the end of August is the deadline.

I had to do a Sensitivity lesson on bias, diversity and inclusiveness. It said I was randomly selected to do that. I asked Bob in HR, (please don't mention to him) he told me the computer randomly selects people and I was chosen.

Also, every time I make a small error on the Submittals, it becomes an announcement to everyone. I am not allowed to do the whole submittal, my co-worker names them and give them numbers and then she emails them to me and tells me to just give them numbers through the program Aconex and send them through. I'm being humiliated in this job on a daily basis. This has been going on for weeks. I know what they're doing, but I can't do anything about it without getting a reputation for complaining against co-workers.

I have considered telling this co-worker that she should do the whole document and if she wants me to do a document, then I should do that one. But those ladies have worked/working to take away all that I accomplished as a "competent, knowledgeable worker when I first arrived. Mind you, Paul had asked them since April to start training me, so when they finally get around to at the end of June, this is what I get from them. He literally had to MAKE them start training me. Now they want to treat me as if I can't/haven't learned.

Last night when when it was time to go, the woman had said to Paul, goodnight, have a nice weekend and everything. Then she discovered that I was staying over a little late and she would not go home, she decided to stay a until after I left. 7/12/19.

Then one day when I was finishing up work, she wanted me to leave out the building when she left, I told her as soon as I'm done, I have a little bit more to complete this document, I'll be leaving. 15 minutes later when I got to the parking lot, she was sitting in her car. She did not pull off until she saw me pulling out the parking lot. (scary)

Thanks for listening.

**Claudia Bell, MCAS**
Microsoft Certified Application Specialist #7760369
Corona, CA
Cell: 951-284-8032

Re: OC405

From:  Claudia E. Bell (perfect992@yahoo.com)

To:  cassandra.hendricks@dor.ca.gov

Date:  Monday, July 15, 2019, 06:05 PM PDT


Thanks for your reply Cassandra. It is the same lady. She is the lead in the Document control department. She's next in line to Paul. Paul listens to her and so does the others. They are like a little family. I know where she's coming from, but I can't do anything about it. If I complain to Paul, he's gonna regret hiring me. If I complain to HR, they are going to regret hiring me. If I complain out loud, it gonna make bad and maybe hostile working conditions. I'm gonna keep notes and keep quite. Sometimes this woman is so mean it makes my skin crawl. Then other times, she acts civil. Today was the first day she ever trained me in any thing. Paul has asked her...I wanna say at least 50 times for that one particular training. There are others he's asked her to train me on, that she hasn't done.  I'll be all right. Don't say anything to HR. I realize it will make me have a bad reputation also. I'll keep notes, dates and times.

As long as I can sit at my desk, I'll be fine. I will do all the work with grace and do all I can to make sure it is correct. That's all I can do.

My goal is to have more than 3 - 6 months of a job on my Resume. I looked for a long time, gave up for a long time and now I'm trying again. I want to be successful this time.

God Bless you. Thanks for your support.


**Claudia Bell, MCAS**
Microsoft Certified Application Specialist #7760369
Corona, CA
Cell: 951-284-8032

On Monday, July 15, 2019, 10:31:16 AM PDT, Hendricks, Cassandra@DOR <Cassandra.Hendricks@dor.ca.gov> wrote:

Hi Claudia,

Who is this woman who is doing this? Is this the same one who gave you trouble from the very start? Or someone else? It is really hard to sit on this information because it is totally disconcerting. Of course, I would never say ANYTHING unless you wanted me to.

As far as diversity and inclusion, I guess everyone does things differently. But usually everyone has to do this. Maybe at different time, but everyone has to. Honestly, I don't think the company itself is trying to get rid of you. It wouldn't make sense to hire you and then do that. They do need the help. But, these ladies you are working with have their own agenda. Someone exploiting every little mistake is ridiculous. And waiting to walk out the door with you or in the parking lot is aggressive and scary. Harassment is what it is and that's illegal, plain and simple. It's so disheartening. I don't want you leaving because it allows them to accomplish their goal, but by the same token no one should have to deal with this. How many times have you approached Paul about them? If it's only been once, maybe you need to approach him again and be more specific about what they're doing. Maybe you should put it in writing and ask to speak with him privately. I know how you feel about "telling" on people, but once they're on notice it is their duty to do what it takes to resolve the issue. Clearly, you are not the issue.

Best,
*Cassandra Hendricks*, Business Specialist
790 The City Drive South, Suite 110
Orange, CA 92868
(714) 662-6037 (desk)
Cassandra.hendricks@dor.ca.gov

**From:** Claudia E. Bell <perfect992@yahoo.com>
**Sent:** Saturday, July 13, 2019 11:02 AM
**To:** Hendricks, Cassandra@DOR <Cassandra.Hendricks@dor.ca.gov>
**Subject:** OC405

Hello Cassandra,

I hope all is well with you and your daughter is recovering.

This is a CONFIDENTIAL email.

I never asked this question. After I was hired on at OC405, was I supposed to do a 90 days and then become a permanent hire? If so, then the end of August is the deadline.

I had to do a Sensitivity lesson on bias, diversity and inclusiveness. It said I was randomly selected to do that. I asked Bob in HR, (please don't mention to him) he told me the computer randomly selects people and I was chosen.

Also, every time I make a small error on the Submittals, it becomes an announcement to everyone. I am not allowed to do the whole submittal, my co-worker names them and give them numbers and then she emails them to me and tells me to just give them numbers through the program Aconex and send them through. I'm being humiliated in this job on a daily basis. This

2/3

has been going on for weeks.I know what they're doing, but I can't do anything about it without getting a reputation for complaining against co-workers.

I have considered telling this co-worker that she should do the whole document and if she wants me to do a document, then I should do that one. But those ladies have worked/working to take away all that I accomplished as a "competent, knowledgeable worker when I first arrived. Mind you, Paul had asked them since April to start training me, so when they finally get around to at the end of June, this is what I get from them. He literally had to MAKE them start training me. Now they want to treat me as if I can't/haven't learned.

Last night when when it was time to go, the woman had said to Paul, goodnight, have a nice weekend and everything. Then she discovered that I was staying over a little late and she would not go home, she decided to stay a until after I left. 7/12/19.

Then one day when I was finishing up work, she wanted me to leave out the building when she left, I told her as soon as I'm done, I have a little bit more to complete this document, I'll be leaving. 15 minutes later when I got to the parking lot, she was sitting in her car. She did not pull off until she saw me pulling out the parking lot. (scary)

Thanks for listening.

**Claudia Bell, MCAS**
Microsoft Certified Application Specialist #7760369
Corona, CA
Cell: 951-284-8032

EXHIBIT 14.

EMAIL SENT OUT BY MANAGER PAUL STRAZNICKAS
ON AUGUST 9, 2019, EXPLAINING TO DOCUMENT AND
EVERYONE THAT THE HYPERLINKS WERE BROKEN IN
ACONEX WORLDWIDE

I emailed it to myself so I could have a record of the issue I was
being harassment about

This is also the document I was slandered defamed so bad for at
OC405 Partners

Falsified information concerning this Aconex Document
Register:

Also includes the letter that the attorney claimed I didn't send
and that it would have cost the company its contract and much
embarrassment.

This was used to justify my termination.

4 pages

7/20/2020

Yahoo Mail - Aconex Daily Digest 20190808

Aconex Daily Digest 20190808

From: Claudia Bell (c.bell@oc405.com)

To: perfect92@yahoo.com

Cc: DocControl@oc405.com; W.Parent@oc405.com; A.Abdelbari@oc405.com

Date: Friday, August 9, 2019, 08:06 AM PDT

*The hyperlinks in the digest are not working. This is a system-wide Aconex issue affecting all projects worldwide using hyperlinks in outbound emails.*

*We will keep you apprised of any updates. Thank-you for your patience."*

Good Morning –

Below are the documents transmitted through Aconex on Thursday, August 8, 2019.

## ACONEX DOCUMENT REGISTER

OC 405 Partners JV

**Project:** I-405 Improvement Project (SR-73 to I-605)
**Date:** 8/8/2019
**Generated By:** Ms Claudia Bell, OC 405 Partners JV

| Type | Title | Revision | Status | Review Status | Discipline | Created By | Document No | Hyperlink |
|---|---|---|---|---|---|---|---|---|
| Material Control | [CEM - 3101] Notice of Material to be Used - OC405 Partners [Welded Wire Mesh] | 001 | Final | | Material | OC 405 Partners JV | OC405-MCN-MTL-00060 | Aconex Document |
| Material Control | [CEM 3101] Notice of Materials to be Used - [Long Beach Iron Works] | 001 | Final | | Material | OC 405 Partners JV | OC405-MCN-MTL-00059 | Aconex Document |
| Material Control | [CEM-3101DB] Notice of Materials to be Used - OC405 Partners [EBAA Double Ball Flex Joint] | 001 | Final | | Material | OC 405 Partners JV | OC405-MCN-MTL-00057 | Aconex Document |
| Letter | Additional Services Notification #80 NDC056-Design Review Delays | 001 | Draft | | Change Management | Pacific Infrastructure 405 Designers | PI405-OC405-00582 | Aconex Document |
| Submittal | Bolsa Ave OC Drawings [OC405-SBR-RFC-00140A] | 001 | | Released for Construction | Structures – Bridges | OC 405 Partners JV | OC405-SBR-RFC-00140A | Aconex Document |
| Submittal | Bolsa Ave OC Final Structure SSP [OC405-SBR-RFC-00140B] | 001 | | Released for Construction | Structures – Bridges | OC 405 Partners JV | OC405-SBR-RFC-00140B | Aconex Document |
| Comments Sheet | Bolsa Ave. Bearing Pad Rev001 - Comments Sheet [OC405-SUB-SBR-S00161] | 001 | | Approved | Structures – Bridges | OC 405 Partners JV | OC405-COM-SBR-000067 | Aconex Document |
| Submittal | Bolsa Ave. Bearing Pad Rev001 [OC405-SUB-SBR-S00161] | 001 | | Approved | Structures – Bridges | OC 405 Partners JV | OC405-SUB-SBR-S00161 | Aconex Document |
| Form | Bolsa Ave. OC Bearing Pads Rev001 - QV Cert [OC405-SUB-SBR-S00161] | 001 | | Approved | Quality Management | OC 405 Partners JV | OC405-FRM-QMS-000515 | Aconex Document |
| Letter | Bolsa Ave. OC Bearing Pads Rev001 [OC405-SUB-SBR-S00161]- Approval | 00A | | Approval | Structures – Bridges | OCTA | OCTA-OC405-02726 | Aconex Document |
| Comments Sheet | Casing Spacers (COFV Approved) Rev001 - Comments Sheet [OC405-SUB-MTL-00293] | 001 | Draft | | Material | OC 405 Partners JV | OC405-COM-MTL-000280 | Aconex Document |
| Form | Casing Spacers (COFV Approved) Rev001 - QV Cert [OC405-SUB-MTL-00293] | 001 | Draft | | Quality Management | OC 405 Partners JV | OC405-FRM-QMS-000536 | Aconex Document |
| Submittal | Casing Spacers (COFV Approved) Rev001 [OC405-SUB-MTL-00293] | 001 | Draft | | Material | OC 405 Partners JV | OC405-SUB-MTL-00293 | Aconex Document |
| Letter | Deviation Approval to Skip Intermediate Design Submittal Water Lines Segment 1.2 DL 12.2 | 001 | Final | | Contract Management | OC 405 Partners JV | OC405-PI405-00535 | Aconex Document |
| Meeting Minutes | ECR Meeting Minutes_July_Final_2019 | 00A | For Information | | Environmental | Parsons | PAR-MOM-ENV-000006 | Aconex Document |

Yahoo Mail - Aconex Daily Digest 20190808

| Type | Description | No. | Status | Approval | Discipline | Company | Document No. | Link |
|---|---|---|---|---|---|---|---|---|
| Comments Sheet | Fairview Bent 2 and Abutment 3 - Driven Pile Plan Rev001 - Comments Sheet [OC405-SUB-SBR-S00250] | 001 | Draft | | Structures – Bridges | OC 405 Partners JV | OC405-COM-SBR-000122 | Aconex Document |
| Submittal | Fairview Bent 2 and Abutment 3 - Driven Pile Plan Rev001 [OC405-SUB-SBR-S00250] | 001 | Draft | | Structures – Bridges | OC 405 Partners JV | OC405-SUB-SBR-S00250 | Aconex Document |
| Submittal | Fairview Rd OC Bent 2 - Piles in Conflict with Footing Rebar [OC405-RFI-SBR-0333] | 00A | Draft | | Structures – Bridges | OC 405 Partners JV | OC405-RFI-SBR-0333 | Aconex Document |
| Standard | Final Structure SSP for Service Rd Undercrossing | 002 | | Approved | Structures – Bridges | Pacific Infrastructure 405 Designers | PI405-STD-SBR-000101 | Aconex Document |
| Report | Geotechnical Instrumentation and Monitoring Plan for Design Package Service Rd Undercrossing | 002 | | Approved | Geotechnical | Pacific Infrastructure 405 Designers | PI405-RPT-GEO-000319 | Aconex Document |
| Submittal | Goldenwest OC Use of She bolt and Grout for leveling of plate on pedestal [OC405-RFI-SBR-0329] | 001 | Draft | | Structures – Bridges | OC 405 Partners JV | OC405-RFI-SBR-0329 | Aconex Document |
| Letter | Incomplete Design – MOT Design - Notice of Delay -- Issue No. 13 B | 001 | Final | | Contract Management | OC 405 Partners JV | OC405-PI405-00536 | Aconex Document |
| Record | Letter of Transmittal EPDs_Proof of Delivery 20190808 | 001 | Final | | Contract Management | OC 405 Partners JV | OC405-RECRD-CTM-000001 | Aconex Document |
| Letter | MOT Design - Response to OC405-PI405-00536 | 001 | Draft | | Change Management | Pacific Infrastructure 405 Designers | PI405-OC405-00581 | Aconex Document |
| Letter | PCO 11_CO 8 Hazardous Material | 001 | Final | | Contract Management | OC 405 Partners JV | OC405-OCTA-01536 | Aconex Document |
| Letter | PCO 15_DL 7 Golden West Redesign Authority Caused Delay CN 4610_PCO 122 SCE Delays | 001 | Final | | Contract Management | OC 405 Partners JV | OC405-OCTA-01538 | Aconex Document |
| Letter | PCO 15_DL 7 Goldenwest Redesign_Authority Caused Delay CN 5601_PCO 122 SCE Delays | 001 | Final | | Contract Management | OC 405 Partners JV | OC405-OCTA-01537 | Aconex Document |
| Letter | PCO 31B_DL 12.2 Water Tank Area Improvement Approved Deviation to Skip IDS for Water Lines CN-1020 and CN-8069 | 001 | Final | | Contract Management | OC 405 Partners JV | OC405-OCTA-01533 | Aconex Document |
| Letter | PCO 67_MBGR Length of Need | 001 | Final | | Contract Management | OC 405 Partners JV | OC405-OCTA-01532 | Aconex Document |
| Submittal | REGISTER UPDATE : McFadden OC Post Tensioning Shop Drawings and Grouting Plan Rev001 [OC405-SUB-SBR-S00181] | 001 | Draft | | Structures – Bridges | OC 405 Partners JV | OC405-SUB-SBR-S00181 | Aconex Document |
| Form | REGISTER UPDATE: Talbert Joint Seal Assemblies Rev001 - QV Cert [OC405-SUB-SBR-S00199] | 001 | | Approved | Structures – Bridges | OC 405 Partners JV | PI405-FRM-SBR-000007 | Aconex Document |
| Letter | Request for Deviation Re Minimum Structure Exploration RW RS 573 | 001 | Final | | Contract Management | OC 405 Partners JV | OC405-OCTA-01530 | Aconex Document |
| Letter | Retaining Sound Wall 728 Design – Lack of Progress | 00A | For Information | | Contract Management | OCTA | OCTA-OC405-c2731 | Aconex Document |
| Letter | RETRACTED_Request for Deviation Re Segment 1.3 Minor Grading in TCE Areas | 001 | Final | | Contract Management | OC 405 Partners JV | OC405-OCTA-01531 | Aconex Document |
| Form | RFC Certification NDC040 Segment 3.1 DS757 and Adjacent Westminster NB Ramps | 001 | Draft | | Quality Management | Pacific Infrastructure 405 Designers | PI405-FRM-QMS-000550 | Aconex Document |
| Letter | ROW Access Request for CPN 102919 | 001 | Final | | Contract Management | OC 405 Partners JV | OC405-OCTA-01535 | Aconex Document |
| Letter | ROW Early Access Request for CPN 103379 and 102925 | 001 | Final | | Contract Management | OC 405 Partners JV | OC405-OCTA-01534 | Aconex Document |
| Calculation | Santa Ana River Bridge Design Check Calculations | 003 | Draft | | Structures – Bridges | Pacific Infrastructure 405 Designers | PI405-CLC-SBR-000083 | Aconex Document |
| Comments Sheet | Santa Ana River Bridge Final Design Submittal Comment Sheet | 002 | Draft | | Structures – Bridges | Pacific Infrastructure 405 Designers | PI405-COM-SBR-000119 | Aconex Document |
| Calculation | Santa Ana River Bridge Structural Design Calculations | 003 | Draft | | Structures – Bridges | Pacific Infrastructure 405 Designers | PI405-CLC-SBR-000082 | Aconex Document |
| Drawing | Santa Ana River Bridge Widen Final Design Submittal Plans | 004 | Draft | | Structures – Bridges | Pacific Infrastructure 405 Designers | PI405-DWG-SBR-000432 | Aconex Document |
| Submittal | Seg 1.4 Unforeseen Parapet on top of Existing RCB [OC405-RFI-SBR-0330] | 00A | Draft | | Structures – Bridges | OC 405 Partners JV | OC405-RFI-SBR-0330 | Aconex Document |
| Comments Sheet | Segment 1.2 CN1020 and CN8069 COFV Water Final Design Submittal Comment Sheet | 000 | | Pending | Utilities | Pacific Infrastructure 405 Designers | PI405-COM-UTL-000023 | Aconex Document |
| Drawing | Segment 1.2 CN1020 and CN8069 COFV Water Final | 001 | | Pending | Utilities | Pacific | PI405-DWG-UTL-000651 | Aconex |

7/20/2020

Yahoo Mail - Aconex Daily Digest 20190808

| | Design Submittal Plans | | | | Maintenance of Traffic | Infrastructure 405 Designers | | Document |
|---|---|---|---|---|---|---|---|---|
| Submittal | Segment 2.1 Stage 3A Striping on Beach Blvd and Center Ave (OC405-RFI-MOT-0281] | 00A | Draft | | | OC 405 Partners JV | OC405-RFI-MOT-0281 | Aconex Document |
| Report | Segment 3.1 FDS DL4 Drainage Report | 005 | Draft | | Drainage | Pacific Infrastructure 405 Designers | PI405-RPT-DRN-000076 | Aconex Document |
| Comments Sheet | Segment 3.1 NDC 0040 DS757 and Adjacent Westminster NB Ramps_Consolidated Comments | 003 | Draft | | Roadways | Pacific Infrastructure 405 Designers | PI405-COM-RWY-000077 | Aconex Document |
| Drawing | Segment 3.1 NDC040 DL-4 Affected RFC Plans | 001 | Draft | | Roadways | Pacific Infrastructure 405 Designers | PI405-DWG-RWY-000654 | Aconex Document |
| Calculation | Service Rd Undercrossing Structural Design Calculations | 002 | | Approved with Comments | Structures – Bridges | Pacific Infrastructure 405 Designers | PI405-CLC-SBR-000094 | Aconex Document |
| Calculation | Service Rd Undercrossing Structural Design Check Calculations | 002 | | Approved with Comments | Structures – Bridges | Pacific Infrastructure 405 Designers | PI405-CLC-SBR-000095 | Aconex Document |
| Drawing | Service Road Undercrossing Final Design Submittal Plans | 004 | | Approved | Structures – Bridges | Pacific Infrastructure 405 Designers | PI405-DWG-SBR-000494 | Aconex Document |
| Letter | Service Road Undercrossing Clean Final Design Submittal [DESI-SMS-CCS-053] – Approved | 00A | | Approved | Structures – Bridges | OCTA | OCTA-OC405-02730 | Aconex Document |
| Comments Sheet | Service Road Undercrossing Final Design Submittal Comment Sheet | 001 | | Approved with Comments | Structures – Bridges | Pacific Infrastructure 405 Designers | PI405-COM-SBR-000124 | Aconex Document |
| Report | Service Road Undercrossing Foundation Report | 003 | | Approved | Geotechnical | Pacific Infrastructure 405 Designers | PI405-RPT-GEO-000253 | Aconex Document |
| Form | Surveillance Certification Segment 1.2 CN1020 and CN8069 COFV Water Final Design Submittal | 001 | Draft | Pending | Quality Management | Pacific Infrastructure 405 Designers | PI405-FRM-QMS-000547 | Aconex Document |
| Comments Sheet | Talbert Joint Seal Assemblies Rev001 - Comments Sheet [OC405-SUB-SBR-S00199] | 001 | | Approved | Structures – Bridges | OC 405 Partners JV | OC405-COM-SBR-000111 | Aconex Document |
| Submittal | Talbert Joint Seal Assemblies Rev001 [OC405-SUB-SBR-S00199] | 001 | | Approved | Structures – Bridges | OC 405 Partners JV | OC405-SUB-S00199 | Aconex Document |
| Letter | Talbert Joint Seal Assemblies Rev001 [OC405-SUB-SBR-S00199] _Approval | 00A | | Approval | Structures – Bridges | OCTA | OCTA-OC405-02729 | Aconex Document |

Document Control Tracking Logs (CST RFIs, NCRs, Submittals)

Latest maps for ROW/TCE parcel availability by Segment

**The attached excel sheet is for filtering purposes.  It contains the same information found in the body of the email.**

Should you have any questions or comments, please contact Document Control

Claudia Bell

Data Management Assistant

4/4

7/20/2020

Yahoo Mail - Aconex Daily Digest 20190808

c.Bell@oc405.com

3100 W. Lake Center Dr. 2nd floor

Santa Ana, CA. 92704

Daily Aconex Digest 20190808.xlsx
23.8kB

EXHIBIT 11

EMAIL Plaintiff sent Manager on 10/2/2019

His concern about the quality of my work – never responded

2 pages

Your concerns about the quality of my work

*letter sent before being fired 10/9*

From: Claudia E. Bell (perfect992@yahoo.com)

To: paul.straznickas@oc405.com

Cc: r.rosado@oc405.com

Date: Wednesday, October 2, 2019, 07:56 PM PDT

## TO: Paul Straznicas, Document Control Configuration Manager and Supervisor

Apologizing can't fix the errors but, I apologize because I made the error on the letter today. I hate I didn't triple check. I'm beating myself up about it. I apologize for any spacing issues in letter OC405-OCTA-01669. I also apologize for any other issues you might think I caused that I'm unaware of.

I have the same quality about my work that I had when I first started at OC405. You were very proud of my work as I recall, but now you say it has no quality.

Perhaps you needed to contact Human Resources, but I've seen errors made by others in Document Control and they were treated very differently. I've seen Retraction after Retraction in Aconex and no one was sent to Human Resources about it. Mr. Ashish responded to each of those ladies and asked them to fix the problem by retracting and re sending. I would hope that you could encourage him to communicate with me directly as well, if I ever get another chance to work using Aconex.

My questions are:
1. Are you aware Paul that you treat me so different than you treat the other ladies for the same mistakes or issues? I asked you that question last week? I did not get an answer.

2. What made you change after I was hired?
3. Why are you intolerable towards me?

4. Why do you discipline me so publicly?

5. What happened from the time I started at OC405 demonstrating my years of skills that you were proud to announce all over the company - until now?

6. How can I know your intolerance towards me is not racial or because of my genetics or even because I went to Human Resources because of my concerns?

You asked me what my goals were for the first year at OC405. I told you what they were and you were very happy to learn that I wanted to learn all about and how to do all the different documents that were being produced in Document Control. You said you would see to it that I got training in Document Control. You changed your mind. Its ok, you're the boss.

The questions above are weighing very heavily on me every day that I come to work. I've been nothing but respectful and compliant at OC405 in every area of being an employee, even my work.

Thanks for your response.


Respectfully submitted



Claudia Bell

Data Management Assistant








**Claudia Bell, MCAS**
Microsoft Certified Application Specialist #7760369
Corona, CA
Cell: 951-284-8032

EXHIBIT 16.

HERE IS ANOTHER CUT AND PASTED COPIED OVER
DATE DOCUMENT CONTROL FALSIFIED TO CLAIM
THAT PLAINTIFF TYPED THIS DOCUMENT.


THIS IS A FALSIFIED DOCUMENT OC405s ATTORNEY
USED TO MISLEAD THE EEOC IN THEIR
INVESTIGATION AND SHOW THAT THEY WERE
JUSTIFIED IN THEIR RETALIATION TERMINATION OF
PLAINTIFFs EMPLOYMENT

2 SHEETS



**I-405 Improvement Design-Build Project**
3100 West Lake Center Drive Second Floor, Santa Ana, CA 92704    Phone I (858) 251-2200  Fax (612)-241-0889
OC 40 5 Partners JV is an Affirmative Action/Equal Opportunity Employer
www.oc405partners.com

CL#:1021106

Jeff Mills, PE
Program Manager, Highway Programs
Orange County Transportation Authority
3100 West Lake Center Drive, Ste 100
Santa Ana, CA 92704

August 21, 2019    *Cut +paste Not true Date*

Letter No:    OC405-OCTA-01567

Contract No: C-5-3843    I-405 Improvement Design-Build Project

RE: PCO # 16 – Design Review Delays, Request for Direction Retaining Wall 843

Dear Mr. Mills,

Attached herewith is DJV's letter # 592 dated Aug. 20, 2019 in which the DJV is requesting Direction to finish the design of the above wall.  Due to lack of Right of Way there is no access to maintenance.  Per Contract Section 6.1.3.3 Authority is responsible for all costs to acquire Additional ROW.  Since OCTA indicated they will not acquire Additional ROW, OCTA must issue Direction per Contract Section 13.1.1.2.

Please consider this as augmentation to PCO 16 for all additional costs and time impacts.

Regards,

*[signature]*

Alex Medyn
Project Director
OC405 Partners JV

Attach: DJV's letter # 592

Cc:    Azzam Saad
    Rean Kaliiuli

*Mis Leading and misrepresented to EEOC*

*this letter shoud have an attached Email with it For Instructions who its From*

*also should have a Transmittal Sheet From Aconex*

Aconex #: OC405-OCTA-01567
Date: 20190821
Rev001

*Date*
*First line of letter Date on*



**I-405 Improvement Design-Build Project**
3100 West Lake Center Drive Second Floor, Santa Ana, CA 92704    Phone I (858) 251-2200  Fax I (612)-241-0889
OC 40 5 Partners JV is an Affirmative Action/Equal Opportunity Employer
www.oc405partners.com

CL#:1021106

Jeff Mills, PE
Program Manager, Highway Programs
Orange County Transportation Authority
3100 West Lake Center Drive, Ste 100
Santa Ana, CA 92704

August 21, 2019                                     Letter No:       OC405-OCTA-01567

Contract No: C-5-3843    I-405 Improvement Design-Build Project

RE: PCO # 16 – Design Review Delays, Request for Direction Retaining Wall 843

Dear Mr. Mills,

Attached herewith is DJV's letter # 592 dated Aug. 20, 2019 in which the DJV is requesting Direction to finish the design of the above wall.  Due to lack of Right of Way there is no access to maintenance.  Per Contract Section 6.1.3.3 Authority is responsible for all costs to acquire Additional ROW.  Since OCTA indicated they will not acquire Additional ROW, OCTA must issue Direction per Contract Section 13.1.1.2.

Please consider this as augmentation to PCO 16 for all additional costs and time impacts.

Regards,

Alex Medyn
Project Director
OC405 Partners JV

Attach: DJV's letter # 592

Cc:    Azzam Saad
       Rean Kalliuli

1

18

## EXHIBIT 17.

This is another exhibit of a falsified letter Document Control cut and pasted and copied over that was presented by OC405s attorney to mislead the EEOC in their investigation.

This letter is meant to deceive EEOC so they would believe I would type something like this. Document Control did not type letters: What I was taught Document Control did to Letters:

Add a Letter Number,

Write of the full date

Bold the RE:

Insert the name of the project director

Insert footer – which is the letter no

Add a date in the footer

Add Rev001

And that is all Document Control did to letters they received in the inbox

8 Pages

*Cut and Pasted over Letter head —*

Your ref
Our ref   LTR-619-PM-CJV-ASN-082-Retaining Wall 843 Request for Direction
File ref   PI405-OC405-00592

Alex Medyn
OC 405 Partners JV
3100 West Lake Center Drive
Second Floor
Santa Ana
CA 92704

Pacific Infrastructure 405 Designers
3780 Kilroy Airport Way
Suite 750
Long Beach
CA 90806
United States of America
M: 562.508.0671

August 20, 2019

Dear Rich,

*All Letters come through Doc 9 always on Letter head always comes through Email. See EXAMPLE Letter head —*

**I-405 Improvement Project**
**Additional Services Notification #082, Retaining Wall 843 — Request for Direction**

In accordance with Article 5.4.1 of our Design Agreement, and 13.3.1.1 all subclauses of the Design-Build Contract, for schedule, and 2.8.1 of our Design Agreement and 13.3.1.2 all subclauses of the Design-Build Contract for costs, we are providing notification that OC405/PI405 has potential to realize Authority Caused Delays and added costs effected by incomplete design reviews and late design approvals.

**Background**

Pacific Infrastructure 405 Designers (PI405) submitted Retaining Wall RS843 Final Design Submittal (FDS) on 28th, February 2019. The Authority responded to this submittal on the 28th, March 2019 and categorized the FDS submittal as revise and resubmit within their letter ref: *OCTA-OC405-01946* and provided 43 reviewer comments.

OC405 have worked with the Authority's and have closed all reviewer comments and provided pre-clean copy documents to the Authority's on 5th, June 2019. On July 2nd, PMC confirmed the *"unofficial thumbs up"* status that the PMC has adopted as an initiative to smooth the route to FDS approval/RFC.

Subsequent to this *"unofficial thumbs up"* PMC provided a new unofficial comment on 3rd July 2019 as replicated below:

- *"There needs to be an access to the Sign Post for maintenance".*
- *"The sheet "Masonry wall removal and replacement detail" does not show any access. (TP requirement" )*

On 3rd July PI405 responded to this late, unofficial comment and confirmed:

*Read # PI405- OC 405-00592*

PI405-OC405-00592
Rev Date: 20190820
Rev #: 001

*Cut and Paste —*   *Not true Footer.*

*Font Match*

Page 2 of 3

- *"The deviation request to eliminate the MVP at this overhead sign (841+20 Lt) was approved on 6/8/2018; see attached. It appears that any access to the sign post as requested would require additional R/W from the adjacent property owner; did you have an idea as to how to provide the requested access"?*

Again on 3rd, July 2019 the response from PMC came back:

- *I am not asking for MVP but need access for inspection & maintenance.*
- *"Provide gates at all locations needed for access TP 10.3.9"*

This was subsequently discussed on 11th, July 2019, where PI405 provided the Authority's with 5 viable options to consider, this was followed up via email on 12th, July 2019:

1. *No change; we believe the current design meets contract requirements, since there is no adjacent existing or planned access to provide a locking gate to.*
2. *Keep OH sign at current location; provide soundwall access door in soundwall. Caltrans maintenance to bring ladder to access the sign foundation. No additional R/W impact. May require locking access door.*
3. *Keep OH sign at current location; provide special ladder design attached to retaining wall. There is no standard detail for a ladder attached to a retaining soundwall. No Additional R/W impact. May require locking access door.*
4. *Keep OH sign at current location; place locking chain link gate to allow access from the apartment complex (APN 107-220-59). OCTA/Caltrans to negotiate access rights and removal of obstructing landscaping with apartment complex property owner.*
5. *Move the OH sign to "A" 840+90 Lt. Provide maintenance access from the OCFCD access road along the EGGWC. OCTA/Caltrans obtain new permanent Fee R/W from private property owner at 8480 Wells Road (APN 107-511-65) and access rights from OCFCD. Abandon planned fee take at apartment complex (APN 107-220-59).*

PMC responded on 16th, July 2019:

- *"After discussing with CT Maintenance";*
- *"With OH Sign at current location, please provide Std access gate in soundwall, with ladder attached to RW for safe crew access behind the wall".*
- *"Also please place chain link gate access from apartment complex to allow maintenance equipment access in emergencies".*

PI405 are concerned that as there are no access rights (planned or existing) from the adjacent property owner, this should require a change to the planned R/W limits, however, the Authority has regularly stated that they will not procure additional access rights. We therefore consider this a fatal flaw to the unofficial request that has been made by the Authority's. In addition, there is no standard detail for an access opening through a retaining soundwall.

Technical Provisions (TP) Section 10.2.1 requires us to *"Perform the Work in accordance with the relevant requirements of the Project Standards"*, and the Project Standards do not provide a detail for an access opening through a retaining soundwall.



PI405-OC405-00592
Rev Date: 20190820
Rev #: 001

*CUT + Paste*

Page 3 of 3

We recommend that OC405 notify the Authority of this delay to the Design-Build schedule, and additional costs caused by the Authority or their representatives by not **completing** (emphasis added) their design review of SW738 FDS within the allotted time allocated within TP section 3.3.1.4.

In addition, in accordance with Contract Section 13.1.2 we would request that the Authority issues Direction on how they wish OC405 to proceed with this request, we would ask that this is responded to within 7 days of the date of this letter, in order to mitigate schedule delays.

For the overall good of the Project, we would be happy to meet with OC405 and their Client representative in order to develop and agree strategies and actions that could mitigate and minimize the levels of delay and disruption being experienced by the Design-Build team.

For further information, please contact the undersigned.

Yours sincerely,

Jim McCluskie
Project Executive

Cc:   Tom Poyer
      Kijun Ahn
      Ken Steele
      Chao Chen

cut & paste

PH05-OC405-00592
Rev Date: 20190820
Rev #: 001



I-405 Improvement Design-Build Project
3100 West Lake Center Drive Second Floor, Santa Ana, CA 92704     Phone I (858) 251-2200  Faxl (612)-241-0889
OC 40 5 Partners JV Is an Affirmative Action/Equal Opportunity Employer
www.oc405partners.com

CL#:1021106

Jeff Mills, PE
Program Manager, Highway Programs
Orange County Transportation Authority
3100 West Lake Center Drive, Ste 100
Santa Ana, CA 92704

August 21, 2019

Letter No:     OC405-OCTA-01567



| Cassidy Browning | Utility Task Force Meeting No 112_20190528 | 06/24/2019 | Closed-Out |
| OC 405 PARTNERS JV | TRANSMITTAL | OC405-TRN-010707 | |

| Cassidy Browning | Fwd: Utility Task Force Meeting No 112_20190528 | 06/24/2019 | Closed-Out |
| OC 405 PARTNERS JV | TRANSMITTAL | OC405-TRN-010709 | |



**OC 405 PARTNERS**

| MAIL TYPE | MAIL NUMBER | REFERENCE NUMBER |
| Transmittal | OC405-TRN-010707 | OC405-TRN-010707 |

Utility Task Force Meeting No 112_20190528

| From | Cassidy Browning - OC 405 Partners JV |
| To (4) | Mr Ashish Sharma - Parsons (+3 more...) |
| Cc (14) | Mr Richard Hebert - OC 405 Partners JV (+13 more...) |
| Sent | Monday, June 24, 2019 8:17:47 AM PDT (GMT -07:00 |
| Reason | Issued for Use |
| Status | Closed-Out |

*EXAMple OF Transm.Hal Sheet*

**DETAILS**

| Transmittal Type | Record Document |

**DOCUMENT ATTACHMENTS (1)**

(0 selected)

| File | Document No | Revision | Revision Date | Title | Status |
|------|-------------|----------|---------------|-------|--------|
| | OC405-MOM-UTL-000053 | 001 | 5/28/19 | Utility Task Force Meeting No 112_20190528 | Final |

**ATTRIBUTES**

| Attribute 1 | Utilities |

**MESSAGE**

*Cut + paste*

Your ref
Our ref    LTR-619-PM-CJV-ASN-082-Retaining Wall 843 Request for Direction
File ref    PI405-OC405-00592

*Cut + paste*

Alex Medyn
OC 405 Partners JV
3100 West Lake Center Drive
Second Floor
Santa Ana
CA 92704

Pacific Infrastructure 405 Designers
3780 Kilroy Airport Way
Suite 750
Long Beach
CA 90806
United States of America
M: 562.508.0671

*Cut + paste*

August 20, 2019

Dear Rich,

*Please attachment on Unauthorized users signed on to my computer*

## I-405 Improvement Project
## Additional Services Notification #082, Retaining Wall 843 – Request for Direction

In accordance with Article 5.4.1 of our Design Agreement, and 13.3.1.1 all subclauses of the Design-Build Contract, for schedule, and 2.8.1 of our Design Agreement and 13.3.1.2 all subclauses of the Design-Build Contract for costs, we are providing notification that OC405/PI405 has potential to realize Authority Caused Delays and added costs effected by incomplete design reviews and late design approvals.

**Background**

Pacific Infrastructure 405 Designers (PI405) submitted Retaining Wall RS843 Final Design Submittal (FDS) on 28th, February 2019. The Authority responded to this submittal on the 28th, March 2019 and categorized the FDS submittal as revise and resubmit within their letter ref: *OCTA-OC405-01946* and provided 43 reviewer comments.

OC405 have worked with the Authority's and have closed all reviewer comments and provided pre-clean copy documents to the Authority's on 5th, June 2019. On July 2nd, PMC confirmed the *"unofficial thumbs up"* status that the PMC has adopted as an initiative to smooth the route to FDS approval/RFC.

Subsequent to this *"unofficial thumbs up"* PMC provided a new unofficial comment on 3rd July 2019 as replicated below:

- *"There needs to be an access to the Sign Post for maintenance"*.
- *"The sheet "Masonry wall removal and replacement detail" does not show any access. (TP requirement" )*

On 3rd July PI405 responded to this late, unofficial comment and confirmed:

*Not relevant*

PI405-OC405-00592
Rev Date: 20190820
Rev #: 001

*Cut + paste*

14

*Font match*

Page 2 of 3

- *"The deviation request to eliminate the MVP at this overhead sign (841+20 Lt) was approved on 6/8/2018; see attached. It appears that any access to the sign post as requested would require additional R/W from the adjacent property owner; did you have an idea as to how to provide the requested access"?*

Again on 3rd, July 2019 the response from PMC came back:

- *I am not asking for MVP but need access for inspection & maintenance.*
- *"Provide gates at all locations needed for access TP 10.3.9"*

This was subsequently discussed on 11th, July 2019, where PI405 provided the Authority's with 5 viable options to consider, this was followed up via email on 12th, July 2019:

1. *No change; we believe the current design meets contract requirements, since there is no adjacent existing or planned access to provide a locking gate to.*
2. *Keep OH sign at current location; provide soundwall access door in soundwall. Caltrans maintenance to bring ladder to access the sign foundation. No additional R/W impact. May require locking access door.*
3. *Keep OH sign at current location; provide special ladder design attached to retaining wall. There is no standard detail for a ladder attached to a retaining soundwall. No Additional R/W impact. May require locking access door.*
4. *Keep OH sign at current location; place locking chain link gate to allow access from the apartment complex (APN 107-220-59). OCTA/Caltrans to negotiate access rights and removal of obstructing landscaping with apartment complex property owner.*
5. *Move the OH sign to "A" 840+90 Lt. Provide maintenance access from the OCFCD access road along the EGGWC. OCTA/Caltrans obtain new permanent Fee R/W from private property owner at 8480 Wells Road (APN 107-511-65) and access rights from OCFCD. Abandon planned fee take at apartment complex (APN 107-220-59).*

PMC responded on 16th, July 2019:

- *"After discussing with CT Maintenance";*
- *"With OH Sign at current location, please provide Std access gate in soundwall, with ladder attached to RW for safe crew access behind the wall".*
- *"Also please place chain link gate access from apartment complex to allow maintenance equipment access in emergencies".*

PI405 are concerned that as there are no access rights (planned or existing) from the adjacent property owner, this should require a change to the planned R/W limits, however, the Authority has regularly stated that they will not procure additional access rights. We therefore consider this a fatal flaw to the unofficial request that has been made by the Authority's. In addition, there is no standard detail for an access opening through a retaining soundwall.

Technical Provisions (TP) Section 10.2.1 requires us to *"Perform the Work in accordance with the relevant requirements of the Project Standards"*, and the Project Standards do not provide a detail for an access opening through a retaining soundwall.



PI405-OC405-00592
Rev Date: 20100820
Rev #: 001

*Cut & paste*

**15**

Page 3 of 3

We recommend that OC405 notify the Authority of this delay to the Design-Build schedule, and additional costs caused by the Authority or their representatives by not **completing** (emphasis added) their design review of SW738 FDS within the allotted time allocated within TP section 3.3.1.4.

In addition, in accordance with Contract Section 13.1.2 we would request that the Authority issues Direction on how they wish OC405 to proceed with this request, we would ask that this is responded to within 7 days of the date of this letter, in order to mitigate schedule delays.

For the overall good of the Project, we would be happy to meet with OC405 and their Client representative in order to develop and agree strategies and actions that could mitigate and minimize the levels of delay and disruption being experienced by the Design-Build team.

For further information, please contact the undersigned.

Yours sincerely,

Jim McCluskie
Project Executive

Cc:     Tom Poyer
        Kijun Ahn
        Ken Steele
        Chao Chen

PI405-OC405-00592
Rev Date: 20190820
Rev #: 001

**EXHBIIT 18.**

IPHONE MESSAGE THAT WAS CUT, COPIED AND PASTED OVER TO CLAIM PLAINTIFF CALLED HERSELF THE N-WORD AFTER I WAS TERMINATED

THIS WAS IN THE ATTORNEY'S POSITION STATEMENT AS SOMETHING THAT'S TRUE.

1 PAGE



**10:06**

Brenda💕❯

I only told you what Claudia said to me when she walked in my cubicle and she said y'all treat her like a "nigger"

And you guys had her computer locked

And don't teach her anything because she's from disability and because all you guys see is skin color

**10:06**

Brenda💕❯

Claudia said all that when she was filing stuff in the room for procurement



You didn't tell me all of that!! Lol holly shit

Oh and that she was going to lawyer up

Yeah dude that's when it old her I didn't want to be involved and I even told her I was sorry for not wanting to get involved but she wanted my number Incase I had to testify against anyone if she took someone to court I was like umm no

EXHIBIT 19.

EEOC WITNESS INTERVIEW WITH Bob Rosado, Human Resources Manager of OC405 Partners at relevant time

03/01/2022

Contradictory

- Source – FOIA - EEOC

2 PAGES

# WITNESS INTERVIEW OF Bob Rosado

**Date of Interview: 3/01/2022**

**Time of Interview: 2:07 pm. – 2:32 pm.**

**Interviewer: Lina G. Williams**

**Witnesses' Contact Information:**

Bob Rosado-Not an active OC405 Partners J.V. employee

(b) (7)(C), (b) (6)

Witness states that he is no longer employed with R, and that he left 2 years ago for better employment opportunities. Witness states that he was the HR Director at the R's business. Witness states that they had a call from the EEOC, wherein CP sought out a lawyer, and there was a mediation with EEOC. Witness states that anything that CP had said or emailed was provided to the attorneys.

Witness states that he cannot recollect any details of CP's complaints and is unaware if any of them was alleging discrimination and harassment due to her protected bases and further states, "I document everything, and I do not have access to my notes. Traci Paradai and Traci Boyer both reported to Paul Straznikas, and there were multiple complaints from from CP about them. "Witness states that Paul Straznikas has emails and complaints. Witness states that CP made assertations, "and I do not have recollection of her making complaints about the "n – word. I remember Ms. Bell mentioning being from Disability Program, and she did come to us from the program. I do not have the knowledge of anyone mentioning Ms. Bell was from the State Disability Program, and it did not come up in the internal investigation. I did not know of anyone

divulging the information, and she might have been the one divulging it. I recall a complaint from Traci, and I do not know which one, and we had texts and pictures where one of Traci's was mentioned in it and called a "witch" on social media. I do not know about posting or post-its with "n" word. I know that Claudia called Traci Boyer "a witch" on social media. Witness states that he has no knowledge of Traci Boyer telling people that CP was from the Department of State.  Witness further states that Traci Boyer maybe complained about CP's mistakes to her boss, and "she would not have come to me. I did not hear Ms. Boyer tell staff about Ms. Bell's disability."

Witness states that Traci Boyer was complaining to Paul Staraznikas about CP's performance, because he was CP's supervisor, wherein Paul Straznikas discussed it with him. Witness states, "I recall that there were issues with quality of her work, and Paul Straznikas brought it up to her and to me. There were letters 3-4 letters and 3-4 instances with those letters, and we decided to document them and discipline her. There was another one, and the decision to discipline and terminate her was initiated by Paul." Witness states that CP's Supervisor Paul Straznikas, the Deputy Reen and Alex Dean, Project Director, had a meeting, wherein they looked at the disciplinary action, and Paul Straznikas was the one who made the decision about the discharge. Witness further sates that "We looked at the facts, and we agreed to discipline and discharge her, and it was based on her performance.

Witness states that CP's position was not back- filled, and if it was back- filled, it might have happened after he left the company. Witness states that he has no knowledge as to who CP's successors were and/or whether they made similar mistakes but were able to retain their employment. Witness states that CP was the only one in her capacity, and that no one else performed the same duties and responsibilities.   Witness states that "When we investigated, we did not find anything to substantiate her complaints."

EXHIBIT 20.

WITNESS INTERVIEW OF TRACI PARADAY WITH EEOC

03/02/2022

4 PAGES

- SOURCE FOIA – EEOC

# WITNESS INTERVIEW OF TRACI PARADAI

**Date of Interview: 3/02/2022**

**Time of Interview: 10:03 am. – 11:00 am.**

**Interviewer: Lina G. Williams**

**Witnesses' Contact Information:**

Traci Paraday- Not an active OC405 Partners J.V. employee

████████████

Witness states that her name is Traci Paraday, and that she left OC405 Partners on or about March 14, 2021, and that she resigned because she received a better offer with a company which offered her a full-time remote employment. Witness states that had it not been for that, she would still be with OC405 Partners. Witness states that their Department was called Document Control Department, and that she was a Manager, and it was a billion-dollar highway project for Southern California 405 Freeway. Witness states that the freeway requires a lot of paperwork.

Witness further states, as follows: "I did not have any direct or indirect knowledge of comments about CP's age, race or disability. Towards the end of her employment, Ms. Bell made a comment, and I do not remember, but it was close to the end of her employment, and there were 3 people present, when she made that comment: Paul Straznikas, Tracy Boyer, myself and Alexis Martinez (Romero), and Ms. Bell said, "You are treating me like a nigger." She stood up and said it. We have 4 cubicles in one square. We were standing up and talking to each other. It was all about her being locked out of the system, and she said, "You are treating me like a nigger." No one said anything back to her. All 3 of us looked at each other and said nothing. Immediately, collectively, the same day, and I don't remember the date, we went to Bob Rosado and told him, "Claudia just said, "You

are always treating me like a nigger." I believe Paul Straznikas put it in writing. From HR standpoint, they always tried to do things discreetly. No one has ever said that she was just a tax break and that she was brought from a State Disability Program. When we get a temp, because of the way the company works, we always try to help the community, and I told Bob Rosado, "Can we fill this position with someone who really needs the job?" No one has ever called her an "angry Black woman." That is her perception. I do not have a direct or indirect knowledge of that. She sat exactly across from me. I made sure she sat close to us, so that she would feel as a part of a group, and I invested a lot of my own time to help her, and I was taken aback when she made that statement, and it was the opposite of what I did as a Head of Department. I told staff that we can't leave her here before we headed out to lunch. We invited her to lunch a couple of times, and she said, "No thank you, I have plans, " or "No thank you, I brought my lunch in response to , "Claudia do you want to join us for lunch?" She worked for us for 90-days probation, and she was perfect, professional and very kind, but when she finished the probation, almost everything about her demeanor and professionalism changed. My opinion is once you end the 90-day probation, if you succeed, you become our permanent employee, and shortly thereafter, the performance issues started happening so often, that I could not manage my own time because the team and I had to help her fix things. She was a pleasant kind lady for the first 90-days, but once the employment was secured, then the things changed. I, being the Direct Manager over the ladies, and they work with me, and I am the kindest one of the group, I always made sure she felt comfortable. She would email me constantly and telling me I was locking her out of the system and how dare I lock her out. I forwarded them to HR, and HR advised me not to respond and ignore them, and to inform HR but not to engage. I took a vacation, and she called me on my personal phone, because I gave it to her to call if she was stuck in traffic. I was taking a long weekend, and she called me, yelling and saying why was I taking her work away from her. HR told me not to engage. Ms. Bell 's accusation about insufficient training is a false accusation. We have a form that indicates who the Trainer is, what the training is, requiring signatures of a Trainor and a Trainee, and it is called "Training Record Form" to prove we provided training. And everyone in the department has it to preclude someone from saying, "you did not provide the training. "I sat with Ms. Bell and put the name on the form, training type, and we went through training and we checked boxes on

the form, and I asked her if she could do it independently. Both the Trainer and the Trainee sign the Form. Out of all in our Department, I was the best Trainer, and I had the most forms. I had 15-20 form for different exercises I had with Ms. Bell. Each exercise was within the program called EDMS. Ms. Bell signed all of the forms and said, "Oh, I understand," and I had her do the exercises, watching her and telling her, "I do it, now you show me." Her mistakes were noticed by Parsons, and they would contact us after we submit documents for their review, and they constantly told us Ms. Bell was making mistakes. She was showing me, and she was doing it right. When we sat together and went through exercises slowly, she could do, but in a midst of a busy day doing multiple things, maybe she forgot. She was very good at taking notes, but she was making mistakes. I thought she would refer to her notes and would be fine, but so many were coming, and the client told me, "I don't want her sending anything down here." We started taking her responsibilities away, but there were a lot of things that she was still doing for us. Her behavior was hostile, and she would say, "you guys are treating me as a nigger," although she said it only once. She sent me emails accusing me of locking her out of the system and not letting her do her job. I forward the emails to Bob Rosado. She may have been disciplined before termination, but HR kept it confidential. I approached with things that were incorrect and told her, "Let's revisit, let's sit down, "and she would say, "I don't need it, I have my notes." I think Claudia was terminated because of a combination of performance issues and her demeanor. I don't know for sure, but I think HR discharged her. At the end of her employment, she sat in her cubicle and mumbled, "This is stupid, I am not doing it." We even had an IT come over and investigate her complaints, and IT told her there was no way to get into her computer and remove the work that she did. We investigated every accusation she had made. Most of them I was privy too.

**Investigator's Note:** ███████████████████████████████████████
███████

EXHIBIT 20.

WITNESS INTERVIEW OF TRACI PARADAY WITH EEOC

03/02/2022

4 PAGES

- SOURCE FOIA – EEOC

# WITNESS INTERVIEW OF TRACI PARADAI

**Date of Interview: 3/02/2022**

**Time of Interview: 10:03 am. – 11:00 am.**

**Interviewer: Lina G. Williams**

**Witnesses' Contact Information:**

Traci Paraday- Not an active OC405 Partners J.V. employee

<span style="background-color:black">            </span>

Witness states that her name is Traci Paraday, and that she left OC405 Partners on or about March 14, 2021, and that she resigned because she received a better offer with a company which offered her a full-time remote employment. Witness states that had it not been for that, she would still be with OC405 Partners. Witness states that their Department was called Document Control Department, and that she was a Manager, and it was a billion-dollar highway project for Southern California 405 Freeway. Witness states that the freeway requires a lot of paperwork.

Witness further states, as follows: "I did not have any direct or indirect knowledge of comments about CP's age, race or disability. Towards the end of her employment, Ms. Bell made a comment, and I do not remember, but it was close to the end of her employment, and there were 3 people present, when she made that comment: Paul Straznikas, Tracy Boyer, myself and Alexis Martinez (Romero), and Ms. Bell said, "You are treating me like a nigger." She stood up and said it. We have 4 cubicles in one square. We were standing up and talking to each other. It was all about her being locked out of the system, and she said, "You are treating me like a nigger." No one said anything back to her. All 3 of us looked at each other and said nothing. Immediately, collectively, the same day, and I don't remember the date, we went to Bob Rosado and told him, "Claudia just said, "You

are always treating me like a nigger." I believe Paul Straznikas put it in writing. From HR standpoint, they always tried to do things discreetly. No one has ever said that she was just a tax break and that she was brought from a State Disability Program. When we get a temp, because of the way the company works, we always try to help the community, and I told Bob Rosado, "Can we fill this position with someone who really needs the job?" No one has ever called her an "angry Black woman." That is her perception. I do not have a direct or indirect knowledge of that. She sat exactly across from me. I made sure she sat close to us, so that she would feel as a part of a group, and I invested a lot of my own time to help her, and I was taken aback when she made that statement, and it was the opposite of what I did as a Head of Department. I told staff that we can't leave her here before we headed out to lunch. We invited her to lunch a couple of times, and she said, "No thank you, I have plans, " or "No thank you, I brought my lunch in response to , "Claudia do you want to join us for lunch?" She worked for us for 90-days probation, and she was perfect, professional and very kind, but when she finished the probation, almost everything about her demeanor and professionalism changed. My opinion is once you end the 90-day probation, if you succeed, you become our permanent employee, and shortly thereafter, the performance issues started happening so often, that I could not manage my own time because the team and I had to help her fix things. She was a pleasant kind lady for the first 90-days, but once the employment was secured, then the things changed. I, being the Direct Manager over the ladies, and they work with me, and I am the kindest one of the group, I always made sure she felt comfortable. She would email me constantly and telling me I was locking her out of the system and how dare I lock her out. I forwarded them to HR, and HR advised me not to respond and ignore them, and to inform HR but not to engage. I took a vacation, and she called me on my personal phone, because I gave it to her to call if she was stuck in traffic. I was taking a long weekend, and she called me, yelling and saying why was I taking her work away from her. HR told me not to engage. Ms. Bell 's accusation about insufficient training is a false accusation. We have a form that indicates who the Trainer is, what the training is, requiring signatures of a Trainor and a Trainee, and it is called "Training Record Form" to prove we provided training. And everyone in the department has it to preclude someone from saying, "you did not provide the training. "I sat with Ms. Bell and put the name on the form, training type, and we went through training and we checked boxes on

the form, and I asked her if she could do it independently. Both the Trainer and the Trainee sign the Form. Out of all in our Department, I was the best Trainer, and I had the most forms. I had 15-20 form for different exercises I had with Ms. Bell. Each exercise was within the program called EDMS. Ms. Bell signed all of the forms and said, "Oh, I understand," and I had her do the exercises, watching her and telling her, "I do it, now you show me." Her mistakes were noticed by Parsons, and they would contact us after we submit documents for their review, and they constantly told us Ms. Bell was making mistakes. She was showing me, and she was doing it right. When we sat together and went through exercises slowly, she could do, but in a midst of a busy day doing multiple things, maybe she forgot. She was very good at taking notes, but she was making mistakes. I thought she would refer to her notes and would be fine, but so many were coming, and the client told me, "I don't want her sending anything down here." We started taking her responsibilities away, but there were a lot of things that she was still doing for us. Her behavior was hostile, and she would say, "you guys are treating me as a nigger," although she said it only once. She sent me emails accusing me of locking her out of the system and not letting her do her job. I forward the emails to Bob Rosado. She may have been disciplined before termination, but HR kept it confidential. I approached with things that were incorrect and told her, "Let's revisit, let's sit down, "and she would say, "I don't need it, I have my notes." I think Claudia was terminated because of a combination of performance issues and her demeanor. I don't know for sure, but I think HR discharged her. At the end of her employment, she sat in her cubicle and mumbled, "This is stupid, I am not doing it." We even had an IT come over and investigate her complaints, and IT told her there was no way to get into her computer and remove the work that she did. We investigated every accusation she had made. Most of them I was privy too.

**Investigator's Note:** ███████████████████████████████
███████

EXHIBIT 21.

WITNESS INTERVIEW OF TRACI BOYER WITH EEOC

03/02/2022

SOURCE FOIA – EEOC

4 PAGES

# WITNESS INTERVIEW OF TRACI BOYER

**Date of Interview: 3/02/2022**

**Time of Interview: 8:14 am. – 9:00 am.**

**Interviewer: Lina G. Williams**


**Witnesses' Contact Information:**


Traci Boyer- Not an active OC405 Partners J.V. employee

███████████████████████████████

████████████

████████████


Witness states that she is no longer employed with OC405 Partners, and that her job title was a Document Control Lead.  Witness states that she does not remember "saying that at all" in reference to Brenda Cortez telling her and Ms. Martinez in a group of people during lunch that CP was "sent here from the State, that I have a disability and that I am just a tax break for OC405, and that is the only reason why I'm here."

Witness states as follows: "I was not assigned to train Ms. Bell. Mr. Straznikas was assigned to train Ms. Bell. I did not do provide any training to Ms. Bell. Paul Straznikas hired her to do a certain task, and he trained her on how to do it. The Owners, Parsons, which is a big company, requested more tasks, and he asked others to train her. It was the whole Document Control Department. Alexis Martinez (Romero), Traci Paradai and others, and I don't remember their names, were supposed to train her. In our Department, we all had a direct knowledge of it. I did not personally train her, and I do not know if she was properly trained. I personally observed others train her. I saw Alexis Martinez (Romero), Tracy Paradai and Cassidy LNU and Paul train her. There were a lot of different

trainings, and they were training her constantly, and when errors were made, the training was reiterated, and every time a mistake was made, they retrained her: they trained her how to perform the task, and she did not perform them the way she was supposed to do it. Other people overserved it and told her about it, and she would tell them she was not being trained. All I remember is that she said she felt she was improperly trained, but we trained other people, and they were able to perform the task without errors. I don't remember what her job title was. Traci Paradai trained Cassidy LNU, and specific duties were explained, and everyone was cross-trained, and we all knew how to train. We had a EDMS, electronic document management program, and it had to be done a certain way, and that is where the mistakes were made prior to submission to the Owner. If I recall, she was only responsible for a few items, it was not a lot, and it was not complicated. She could not grasp it and had difficulties, but it seemed that everyone around that area grasped it. I know for a fact that she was trained several times on the same tasks, and the mistakes still occurred."

In response to a specific comment made by Ms. Cortez to staff on or about October 8, 2019, "I only told you what Claudia said to me when she walked in my cubicle, and she said y'all treat her like a "nigger," and you guys had her computer locked and don't teach her anything, because she's from disability and because all you guys see is skin color," witness states, " No one in that company will use that terminology, no one used that against her. The computer was not locked. She did not understand how to get in with a password. We did train her." In response to a specific comment made by CP re: incident occurred on or about August 9, 2019, "I was in the break room/coffee room, and I complemented Brenda on the pretty green dress she was wearing. She started talking about Traci Boyer. She told me that she wanted her friend, Alexis Martinis, to stop listening to Traci Boyer because Traci always talked racist stuff and convinced Alexis to be Racist. During this same conversation, Brenda said to me, why don't you just go in there and be the "stereotypical angry black woman" and just tell them off?" Witness states she was never privy to the conversation between Brenda Cortez and Claudia Bell. Furthermore, witness states, "Brenda Cortez worked for a different department, and she did not work

for Document Control Department." Witness states about CP, "She attacked me on Facebook. I wanted a shirt that referred to me as an October girl, and she called me a "witch." I don't know how old Ms. Bell is, but I will be 60 this year. I did not hear anything about Ms. Bell that had to do with her age, I do not know how old she is. I did not hear anything about Ms. Bell's disability and/or that she came from a State Disability Program. I did not hear any racial comments made to Ms. Bell directly or indirectly. Bob Rosado is Black, and I am not sure if he identified that way, I consider him African American. There was a gentleman out in the field, and he was in the office, name unknown, he was Black. It is a really big company, and there were people out in the field, and we were stuck to our department. Our Department was called Document Control Department. Ms. Bell was not singled out or treated differently, as far as I am concerned. I heard complaints about her work, because I reviewed the work, and those who complained about Ms. Bells work were Alex, Tracy Paradai, the Owners, Parsons, their Document Control Department Representative (name unknown). Parsons' is a huge corporation, and they complained about the work that she performed. There was never anything said about her, it was about her work. Ms. Bell was terminated, but I don't know the specifics, but it was all about work. In document control, it is the permanent records of public, and they need to be correct how things move from point A to point B. She needed to pay more attention to what she was doing. When she was told something, she was doing it correctly for a few items right after she was trained, and then she would start making mistakes on the tasks that she had already performed correctly. I think she was frustrated with the work, and she wanted more work, but there wasn't more work for anyone. If there was no more work to be offered, she had to go back and check on her work. When there was no more work to do for anyone, she felt there was no more work to do for her. Because she was not performing the tasks, and I am sure she was doing her best, but it was not being done correctly and it lead, ultimately, to her dismissal. We get paid, and we go back to our family. I think she felt we were singling her out, but we were not, but there was no more work. She was trained on specific things, and she could not

complete them. It was not an easy job, but we hired somebody after her, and the person was hired, but not hired to fill her position, but the absence of Claudia left a whole, and we brought it a Document Control Clerk, and I do not know the race or the age of the person. I do not know who made the decision to discharge Ms. Bell. The only one I can think of is Paul Straznikas. There was an internal investigation, but I don't remember being interviewed, but I think it was all of us. I probably was interviewed. Bob Rosado conducted the internal investigation, and it took more than a day. I can't think of anything else to say. I liked her, and I did not have any issues with her other than her work. Brenda Cortez is a catalyst in all that. She was having her own performance issues, and she started a revolution. She wanted everyone to know that it is not her, Brenda Cortez's performance, and that it is the company's fault."

EXHIBIT 22.

EEOC AFFIDAVIT – PAUL DONALD STRAZNICKAS

WRITTEN STATEMENT

Paul's contradictory statement

-Source – FOIA – EEOC

8 pages

## EEOC AFFIDAVIT

*(This form is affected by the Privacy Act of 1974. See Privacy Act Statement on reverse before completing this form.)*

| NAME: **Paul Donald Straznickas** | TELEPHONE NUMBER (Give area code) HOME: | WORK: **(714) 944-7400** |
|---|---|---|

ADDRESS (Number, street, city, state, zip)

**OC405 PARTNERS**
**3100 West Lake Center Drive, Suite 200**
**Santa Ana, CA 92704**

### THE FOLLOWING PERSON CAN ALWAYS CONTACT ME

NAME AND TELEPHONE NUMBER

ADDRESS (Number, street, city, state, zip)

### STATUS OF EMPLOYMENT

| CHECK ONE: | | NAME OF EMPLOYER |
|---|---|---|
| **X** WORKING | ☐ NOT WORKING ☐ SOUGHT EMPLOYMENT AT | **OC405 PARTNERS** |

| TYPE OF BUSINESS **Controller of the documents for projects for client Orange County Transportation Authority** | DATES OF EMPLOYMENT FROM: **May 2017** TO: **Present** WHEN EMPLOYMENT WAS SOUGHT FROM TO: |
|---|---|

| POSITION TITLE **Configuration Manager** | DEPARTMENT **Document Control Department** |
|---|---|

ADDRESS (Number, street, city, state, zip)

**OC405 PARTNERS**
**3100 West Lake Center Drive, Suite 200**
**Santa Ana, CA 92704**

My name is Paul Donald Straznickas. I have been working for OC405 Partners as a Configuration Manager since May 2017. I was hired on May 2017, and my business address is: 3100 West Lake Center Drive, Suite 200, Santa Ana, CA 92704. My phone number is: (714) 944-7400. Prior to OC405 Partners, I worked for Walsh Construction in CA, quartered in Illinois, as a Configuration Manager from approximately 2015 until May 2017. Prior to that, I was working for Shimmick Construction in CA as a Configuration Manager for 3 years. I had the same job title in the company. I have degrees obtained through my education which are relevant to my current job with OC405 Partners. I have an Associate Degree in Electronic Engineering, various certificates and Federal Aviation Administration Airplane and Power Plant License. I have received a specialized Title VII, ADEA and ADA training related to the line of work I am currently in: I had both in-person and online training for HR requirements for the company, and I had prior training with Shimmick Construction and Walsh Construction. I have received training provided by HR which was required, but I am not aware of the syllabus. Last time I received the training was in or around 2020. The training was in writing and on-line, watching video and questions and answers that were provided for multiple choice. The ADA training covered items re: preventing disability discrimination and being neutral with respect to disabled people. My understanding of the provided trainings is that no discrimination is allowed based on age or gender. We have people that are all genders. Training was covering on all the topics under Title VII, ADEA, ADA.

My job duties are managing all of the plants, specs, IT systems behind plants and specs, quality of those plants and specs, and we have transmittals we provide to the client, accuracy, since we are the controller of the documents for the projects. Our current project is with the Orange County Transportation Authority, along with Caltrans, and our client is Orange County Transportation Authority. I have not held any other positions, and this is the only position I have held with the company. I have had two supervisors who have left. My current Supervisor is Nehal Patel (Indian), Quality Manager, and he has supervised me beginning

the month of October 2021 to present. I also reported to Wahed Abrahim (Middle Eastern descent), Construction Manager, who supervised me from in or around January 2019 until in or around October 2021. I also reported to Richard Hebert (Caucasian), Project Director. They were both my Immediate Supervisors. I am not sure why Mr. Hebert left, and Mr. Abrahim transferred to another project within the same company. OC405 is a joint venture, and Mr. Abrahim came from OHL and he returned to OHL. I do not know what the abbreviation stands for. I report to Mr. Patel weekly, for the most time every other day, and I have to report to him the status of documents and personnel and the status of approval of any items that need special attention. My work hours are Monday - Friday 8 am -5:00 pm.

Yes, I know Claudia Bell, and it has been two years. She worked in our Department of Document Control. I worked with Ms. Bell from March 1, 2019 until October 2019, when she left. She was dismissed. As to my supervision of Ms. Bell, I was not in the day to day management role of Ms. Bell, but she did work for us. Her Immediate Supervisor at the time was in the Document Control Department for Traci Boyer (Caucasian), who was a Quality Records Manager, and Ms. Bell assisted other document control people with the quality records and correspondence, she was training, and she had to have a specific on-the job training. Ms. Bell was in a training program, and I authorized her timecards and timesheets. She reported to me as far as hours, and the specific training was provided by me for some items, but the majority items she had re: document control area, she trained with a few individuals, and Ms. Boyer was a Lead. There was no formal training program, it was shadowing, and once competency level was reached, she was allowed to process documents on her own. There was no probation period, and the review was based on performance. Ms. Bell was hired as a permanent employee at-will for on the job training. Ms. Bell was also trained by Cassidy Browning (Caucasian), former employee, who provided insurance support to other department and was a Correspondence/Letter Lead for Document Control Area. Ms. Browning is no longer employed, she resigned a while ago. Those were the two primary people that trained Ms. Bell, as well as Ms. Traci Paraday (Caucasian), Document Control Manager. She turned in her resignation around May 2020. As far as being her first-line supervisor, I am not sure how to answer that. I oversaw all of her training, and approved her timecards, and I believe I was the one who approved her time. It was a shared responsibility between myself and Tracy Bell, but Ms. Bell reported to me. Between 03/11/2019 - 10/09/2019, I supervised a team comprised of Traci Boyer, Alexis Romero (Latino), Document Control Lead, and two interns, colleges student interns that were part-time, who only worked for 6 months. I do not recall their names. I do not believe that they worked with Ms. Bell, since they worked in the area of the Quality Records and scanning and processing records that came from the field.

To my knowledge, OC405 Partners has a harassment policy. We do have an anti-harassment policy. It entails 0 tolerance for any type of harassment. The employees are informed of harassment policy through their onboarding training and their continuing training required by HR, which is online and on paper, and it is conducted, I believe, once a year, but I am not sure, and there is a test. I believe the training is separate for managers and staff. As far as your question about records of attendance of those trainings, I believe that this is a question for HR, but I know they track it, and there is a log, but I do not know of any of those specifics.

If there is any complaint made to me by a staff under my supervision, I address it immediately by notifying HR. The designated person is HR Representative Alexa Last Name Unknown (LNU), she recently got married, and I do not know what her last name is. She was not the HR Rep. when Ms. Bell was there. I believe Bob Rosado (Black) was the HR Manager, who I believe resigned in April or May 2020. Mr. Rosado accepted another position at another company unaffiliated with OC405 Partners.

I believe that there is harassment when I am subject to a variety of things that make me uncomfortable. I consider race-based harassment to be harassment that makes people offended by being differentiated from

others because of their race, offended by verbal means, by exclusion means, could be retaliation means and a variety of ways in which they could be harassed. It could be mental, verbal, exclusionary. Age-based harassment would be basically anyone who is harassed if they are an advanced age. I do not see age as a problem. It would be someone over 40 who is excluded, passed by, not allowed to be accepted and is denied a task or a position due to their age. Disability-based harassment is when given a task, they do not have an accommodation to complete it, they are limited not to participate in the task without an accommodation and a variety of different ways they could be excluded, limited or passed over. The records of employees' complaints are maintained, because I know there are files and records, but HR would be able to answer those questions, since I do not have the knowledge as to how those records maintained. The employees' complaints are investigated, HR takes the lead, but I do not know the specifics, I only know that there is a formal process through HR. I do not have any knowledge from other management staff or from any employee about any complaints of harassment, discrimination and retaliation based on their race, age and disability. If anyone complains to me, I try to take down notes, the time of the occurrence and try to get the specifics, and immediately try to get them in contact with HR to have their issues more formally expressed. I would provide those notes to HR.


I do not believe Ms. Claudia Bell complained to me. Those issues were addressed in the emails to HR. I do not have any recollection of her complaints.  I believe she wrote some emails to Mr. Bob Rosado in HR.  I was not privy to some of those emails, but basically, some were about issues with Traci Boyer. Ms. Bell's work quality was indicative of errors, and Ms. Boyer pointed them out to Ms. Bell, and I was involved with her complaints when the computer was hacked: someone looked at it, and most of those items were handled by HR. My knowledge of Traci Boyer finger pointing at Ms. Bell is that I did not sit directly by them, and I am not aware of it. I have no direct or indirect knowledge of it. I do not recall. I know that that accuracy really mattered, and rules had to be followed, and I think there might have been some problems with Ms. Bell's work. I told Ms. Bell about the work product having to be proper and exact. The last conversation was probably in September 2019, and I had to write "Stop work order," since she made drastic errors in correspondence, when she did not follow the procedures and sent a letter that was important to "no one." In our system Aconex (electronic document management system between OC405 Partners and the Owner OCTA), is the official contractual system that OCTA, the Owner, tells us to use. That document control is critical to the job, and the dates and people to whom the documents are sent to is important, and it is damaging when we do not do that. I do not have any knowledge of the conversation between Alexis Martinez and Traci Paraday about Ms. Bell around June 28, 2019. I do not have any knowledge of the situation when Ms. Boyer was talking about Ms. Bell with Alexis Martinez, wherein Ms. Boyer pointed at Ms. Bell and then drew her finger back. The cubicles (4) were arranged in a quadrium, and Mr. Ramero and Ms. Boyer were in adjacent cubicles, and Ms. Bell was in the next quadrium of cubicles behind them. My office was on the 3d floor, and I was also in the quadrium in the cubicles by Ms. Bell originally. I moved because I needed an office. When I sat next to Ms. Bell, I was in the adjacent quadrium cubicle. Ms. Bell did not tell me that Ms. Boyer and Ms. Paraday pointed the finger at her and laughed. Not to me, she may have told other people. She may have told HR, and possibly, to Mr. Rosado. I do not have any knowledge of that. I do not recall observing Ms. Boyer display a mean demeanor towards Ms. Bell. I do not know why Ms. Bell is telling EEOC that Ms. Boyer was "mean to me, very cold." I do not have any knowledge of that. I know Ms. Bell's work product was sometimes not "where it needed to be." I do not have any recollection of the statement made on July 16, 2019 by Traci Boyer in my presence and that of Alexis Martinez, "Paul said he was going to let Claudia go"? I know that at that time Ms. Bell's work product was not improving. I have no recollection of them saying that in my presence.  I do not have any recollection of Ms. Martinez responding with "Yaaaaayyyyiiii!"  All I know is that Ms. Bell's work product was not improving, and Traci Boyer and Cassidy had to make corrections in Aconex and double check things that were sent out, and there was a lot of extra work that had to be done. I do not know if Ms. Bell used Aconex prior to OC405 Partners, but she said she was familiar with the document control and that she had extensive experience on multiple times. As far as Ms. Bell complaining to me about Ms. Boyer and Ms. Martinez, I think the only recollection I have is that Ms. Bell

stated that she was not making mistakes, while Ms. Boyer and Ms. Martinez said "she was making mistakes. "Her personal quality control on her work was not where it needed to be. I double checked her work, and it was not up to a par. I am not sure how to address the meeting with HR about unauthorized users log into Ms. Bell's computer at the same time she was on it. There was a time when she was concerned other people were logging into her computer. All the computers are managed by our IT people, who have authorized access, and they would be putting patches on everyone' s computer and there would be alerts that there was another log on, and if you looked at it, it would be IT or the Admin or a Supervisor. who were running a patch, and the IT is all remote. I had no other staff that claimed there were unauthorized users. We had Bob Rosado and IT people look at Ms. Bell's computer, and those computers are not owned by us, and they are not our personal computers, that is the way it is.  We provided her an explanation, and she did not believe us.  I remember there was a lot of controversy about the computers after she was confronted about her work deficiencies, which continued to be a problem, and the computer log in time happened around the same time.  To answer your question about why Ms. Bell is telling EEOC that it happened about 5 times in August and September of 2019, I do not recall 5 separate times, but I always asked her to look and see who the logged-on person was. I asked her to show me who had logged on and told her that the computer showed it. She told me many times she was an expert and knew "all about how files worked in computers, "and that there was something up with it. I reported it to IT, and it became a bigger issue, and then it became an HR issue. I know Ms. Bell's quality of work was not where it needed to be. I do not have the knowledge of Ms. Bell reporting the incidents to HR on August 20, 2019. I do not know the dates, but I know she wrote emails to HR about the log in issue. I got pulled into HR and was asked to assist with the issue to confirm there was no unauthorized activity. Mr. Rosado asked me to step into the HR office when Ms. Bell was there. Ms. Bell was shaking her head and may have said that she did not believe us, because she had extensive experience. My knowledge of Ms. Bell complaining about it in writing, as well as having a meeting about in on September 5, 2019 with Bob Rosado, HR Director, is that there might have been some emails.


As far as my knowledge of Ms. Bell's complaints of harassment and discrimination to her colleagues, I found out after the fact there was not a good relationship between Ms. Boyer and Ms. Bell. I have an indirect knowledge of it. All I know is that Ms. Bell told me her work was good when it wasn't. Ms. Bell thought her work was good, when Ms. Boyer had to redo her work. There were multiple incidents when we would chat, and Ms. Boyer was the one who looked at the items being put in Power Point and who looked at the correspondence. Ms. Boyer made comments to me, "the errors in the SharePoint are numerous; the tagging is wrong, naming of documents was incorrect."  Between 03/11/2019 - 10/09/2019, I heard on two incidents Traci Boyer (White), Document Control Lead, make comments to staff about Ms. Bell.  During that time, Ms. Boyer made comments to staff about her work quality, specifically, to Tracy Paraday, Alexis Ramero and Cassidy Browning. I heard them on two incidents, when Ms. Boyer was telling that Ms. Bell had numerous errors in her work and said, "try to help her and try to look at her work to make sure it was accurate."  Between 03/11/2019 - 10/09/2019, I did not hear Ms. Boyer tell staff that the only reason Ms. Bell is here is because she came from the state, has a disability and is a tax break for the company. I have never heard staff use the "n" word with respect to Ms. Bell.  As far as hearing about it directly or indirectly, I found out through HR at the end when Ms. Bell sent the email to HR about the use of n word. I learned that from HR, Bob Rosado, who told me that Ms. Bell had claimed that she sent him an email complaining about staff using the n word. I believe Ms. Bell meant Ms. Boyer. That is what I saw in the HR email. The situation was handled with HR exclusively, I was not a part of it. I do not have the knowledge of that, because Bob Rosado handled that. To address your question about my saying, "All this shit up in here" in reference to Ms. Bell when I told Ms. Tracy Boyer I was on the way to a meeting, I do say occasionally "Up here," which meant it is above my head, as if I am not even involved in it. To answer your question about why Ms. Bell is telling the EEOC that I looked at her in an angry and demeaning look and rolled my eyes while looking at her, I do not recall looking at Ms Bell angrily and rolling my eyes. I do not talk angrily to people. I do not recall that interaction. I do not recall that at all. I do not recall observing Tracy Boyer come to Ms. Bell's desk 4 times and telling her the same thing, standing across

from my desk and hollering across from her desk. I do not have any knowledge of Ms. Bell complaining of Ms. Boyer's comment to other management staff. The complaints were made exclusively to Mr. Rosado. Yes, I am aware that she complained about Ms. Boyer's comment to Mr. Rosado. As to whether Mr. Rosado ever addressed Ms. Bell's complaints to me, that was HR item, I was brought in as her Supervisor to sit in on a few areas. I sat in on those meetings maybe 2-3 times, and I would end up leaving before the meetings between Ms. Bell and Mr. Rosado before they were finished. I am not aware of her reactions to those meetings. I do not have any knowledge of Ms. Bell's complaint on or about August 10, 2019, and in or around October 2019, to Mr. Rosado and to me in writing about the training, the attitude and that Alexis was hollering and screaming at her, putting documents on her desk. It could have been one of the meetings with Mr. Rosado, and I have no details of that meeting.  I have no knowledge of that complaint alleging disparate treatment and harassment based on race, age and disability. I have no knowledge of Ms. Bell's October 4, 2019 complaint to Bob Rosado about race and age discrimination.

I am not sure why Ms. Bell is telling the EEOC that I did not provide her with an adequate training on her job-related duties.  I believe we gave her a very good training, repetitive training, and at the same time she represented she did not need a lot of training because of her extensive experience. She always said she knew all the basics on expert level document management. Her work product showed after shadowing, side to side training, that she did not deliver. She would say, "Oh I know this, I have been doing this." She said it to me, to Ms. Boyer, to Alexis Martinez and other people who tried to help train her. She was the only Black female employee. Mr. Rosado was a Black male employee, but no one else in our department was Black. In response to Ms. Bell's claim that Bob Rosado (Black), Human Resources Manager, did not provide her with an adequate training on her job-related duties, he was the contact person for the training for organization. I think that Bob Rosado was the source, he was the provider and brought her along with others from other organization, and she was brought to our department to receive the training. She always said she did not need a lot of training. Mr. Rosado used his contact with the Training Program, and he brought Ms. Bell in. I do not know the name of that program.  Between 03/11/2019 - 10/09/2019, there were no other Data Management Assistants who reported to me. Some of those individuals are no longer employed, but I can identify the name, job title and each individual's race and age.  Ms. Bell was the only Data Management Assistant. There was no other Data Management Assistant before Ms. Bell. The job title was created to meet the staffing needs.  Traci Boyer (White), over 50, reported to me. Traci Paraday (White), over 50, reported to me. Alexis Martinez, mid to late 20ies, (currently Romero, Latino) reports to me.  Cassidy Brownin is probably in her mid 20ies. (White). She was splitting her work efforts with Insurance area for the project and helping with correspondence in Aconex, and she reported to me. Ms. Boyer, Supervisor, Ms. Paraday, Supervisor, Ms. Martinez, Lead, and Ms. Browing, Insurance and Claims Administrator/Lead, do not have duties and responsibilities similar to those of Ms. Bell. I would say Ms. Browning was Senior to Ms. Bell. Their job duties are different from those of Ms. Bell.

There is a formal disciplinary action, and it is up to HR, but usually there would be a disciplinary notice, and I believe there were some disciplinary actions. There was at least one disciplinary notice, and there was verbal counseling. I do not have the details about disciplinary actions, it would be in Ms. Bell's HR file. My knowledge of Tracy Paraday signing the paper showing that Ms. Bell made two mistakes is that I think that was a disciplinary notice issued by Ms. Paraday, because it was her direct, my indirect area. Cassidy supported Tracy Paraday, who was the Head of Document Control/Correspondence area.  Those 2 mistakes Ms. Bell made were catastrophic area and were monumental mistakes. I do not know if Ms. Paraday has the authority to sign such a document, but she had the knowledge to complete the disciplinary action.  Ms. Brenda Cortez is not currently employed.  I do not recall her specific job title and the name of her immediate supervisor.  HR will have the answer to the question. I do not know if between 03/11/2019 - 10/09/2019 Ms. Brenda Cortez had different supervisors and/or what their names are and the dates of their supervision. Between 03/11/2019 - 10/09/2019 the training that was provided to the only Data Management Assistant Ms. Bell was an on the job training, onboarding training, which she completed, and she had Microsoft and filing and SharePoint experience before that. We provided her a specialized training. We did not deny her any training, and there were no classes.  What I think of Ms. Bell as an

employee is that her quality of work diminished, and we had to do re-work, which had to be done only once, and it came to a point where we could not get it done the first time. She asked me if there was a probation period, and after that her work started to suffer in quality. After 90 days her performance was not to a par, and her competency was not increasing. There was no probation period. As her Immediate Supervisor, the deficiencies in her performance were mistakes, errors, omissions, incorrect addresses on crucial correspondence. Ms. Bell was made aware of those deficiencies all the time. We would do our internal quality control on the daily basis, once a week, at the minimum, but if not daily, every other day. We also manage the quantity of work. There was no daily quota, but we wanted to give her a task and see how she performed. We checked the quality and the quantity of work. Omissions, errors and misclassifications are more proper terms to describe her work performance. Inadequacies is not a proper term. We showed Ms. Bell examples of how to correct some of the errors. As her Immediate Supervisor I provided her with a counseling as to how to improve. I would sit with her and show how to do it, and what areas of documents to look at and how to name things. The way Ms. Bell responded to the provided counseling was that, initially, she was open to criticism, but it got to a point where she would say, "I don't make mistakes, I have extensive experience."" As to the availability of evidence of the provided counseling offered to Ms. Bell on account of her mistakes, the majority of it was sitting down with her. There may have been other documents that I was not copied on. I can't say there is nothing documented. I found it easier to sit down with her and show it on the screen. If I sent an email, I would have to go and explain it to her.  Yes, Ms. Bell was disciplined, and there was a disciplinary notice. They may have been verbal warnings, but they will be in the HR file. Disciplines here are formal and on paper, and I do not have access to those files. I would not know if there is any record of discipline in her personnel file. To describe my interaction with Ms. Bell towards the end of her employment, she became non-cooperative and would always say that she had extensive experience and knew what she was doing. It was not cordial at the end. Every time I was at her cubicle, she was assuming something was wrong, but it was not.

After Ms. Bell's discharge, no one was hired immediately to do Ms. Bell's job. Not immediately, and we were back filling the job with another intern. We have no one who filled in the position. After Ms. Bell left, we had two interns who worked part-time and split the job. Now we have no one in that position. We are at a different phase of the project, and the company is not looking to fill Ms. Bell's exact position. The project has now changed from a very busy active construction job to a job that is 75% complete. When she started, it was 25% complete. The Interns were Middle Eastern in their senior year in college, early 20ies, and one was male, the other one female. Mohamed Ankir left in May 2021, and Aya LNU left in January of 2021 and was hired full-time as a Field Engineer.

In terms of feedback provided to Ms. Bell on account of her job performance, I always tried to be very positive when she was doing well and tried to show her the mistakes early on.  My response to Ms. Bell's statement that I complimented her when Ms. Tracy Boyer trained her on the bridge and drainage numbers, wherein Ms. Boyer said "Oh, please" is that I do not recall that, but I did compliment her, and we gave her a raise because she was showing a progress, 3 months in. My response to Ms. Bell's statement that I complimented her every day of the week in May, June and the first part of July 2019 is that I was trying to be positive and help her along. I told her she was learning and starting to understand a complex system, and that it was good that she was learning, that accuracy was accruing and that her understanding was better. During her employment with the company Ms. Bell was evaluated three times. Yes, that is part of the program. My knowledge of her progress reports is that I do not know what the progress reports reflected for the 1 and 2d, but I did not participate in the 3 report. The progress reports for the first one was that she was doing well, the second one showed we gave her a raise. I am not sure what the 3d one said. I provided input to Mr. Rosado, and HR would have the information about the progress reports. As to my knowledge about how those progress reports were rated, I do not know the specifics about the ratings, but it would probably be in her HR file. To answer your question whether I told Ms. Bell that a lot of her work needed to be redone, and that the files were not deleted intentionally, I told her a lot of her work needed to be redone, and that it appeared that her claim that other people deleted the files was inaccurate, since she deleted them. The last log on for those deletions showed that she did them.

To answer your question whether in a meeting with me, Jose Martinez (Hispanic), IT Specialist, and Bob Rosado Ms. Bell said that I, Traci Boyer and Alixis Martinez Ramero did it to her due to her disability, Ms. Bell alluded to that, but it did not happen. When we asked her how it happened, she did not provide us with a response. I have no knowledge of Tracy Boyer telling Ms. Bell that she had printed out "Bs" instead of "As," referring to columns. I have no knowledge of Ms. Bell's statement that it was not a mistake; rather, an extra copy that was printed out, but it was usually her answer to most things - that it was not incorrect even when it was, indeed, incorrect, which was the moral of the problem. My response to Ms. Bell's statement that no one in management confronted her about the mistake is that she said that she did not do it or it was not hers, that it was the computer or something else and everything but her.


I have no knowledge of Traci Boyer telling people that Ms. Bell was only there because she came from the Department of State. I do not know anything about Brenda Cortez making a reference to "n" word in a text communication with Alexis with respect to Ms. Bell. I do not know Ms. Cortez. I know she worked here, but not in our department, and I do not know what her department was. Yes, Ms. Bell was the only African American employee on her floor. I do not have any knowledge of Tracy Paraday making a comment about Ms. Bell's race in September 2019, when TV shows were discussed, when she told her, "I know you'd be watching the Maury show." My response to Ms. Bell's statement that on October 2, 2019, I sent her an email telling her to stop work on the documents, because I had concerns about her quality of work is "yes," that was the day when people found out that a very important document did not get sent to the right people, which put us at a disadvantage with the client. I put a "Stop Work" order to prevent other mistakes. My response to Ms. Bell's statement that she never received any verbal warning about her performance and only one email from me is that I found that verbal coaching was better, I did not operate with a warning. When I sent an email, it was a major event I had to document. My knowledge of Traci Paraday telling Ms. Bell that she saw extra files in the directory and asked Cassidy Browning to re-train her via letter is that it was a re-work that Ms. Bell did, because she did not acquire the concept of doing it properly. I do not have the knowledge of a conversation between Ms. Browning and Ms. Paraday, wherein Ms. Browning told Ms. Paraday, "Claudia does not need any additional training. It was something about the directory." My response to Ms. Bell's statement that no one told her in writing or verbally that she needed to have a counseling about her performance is that we were counseling her continuously. If we took the time to write an email, our job would never get done. My response to Ms. Bell statement that if she needed a counseling, she would have received a verbal notification or an email from me is that she did receive verbal counseling and occasional emails from me and received multiple verbal counseling from Ms. Boyer. My response to Ms. Bell's statement that the discipline was issued after she was terminated is that I do not know what discipline Ms. Bell is referring to. I do not know about the sequence, but HR would have an answer. My response to Ms. Bell's statement that, at least 30 times on the daily basis, Traci Boyer would come to her work area and stand there every time I complimented her, wherein she would say, "Oh, please," is that I have no knowledge of that. My response to Ms. Bell's statement that I complimented her on her work 2-3 times a day, as follows: "Thank you, you did a good job;" "Thank you for organizing the data base:" "Thank you for doing a good job," is that I was always trying to be positive. Yes, I did say, "Thank you, you did a good job." My response to Ms. Bell's statement that I stopped complimenting her in the first part of August is that I do not recall that. My response to Ms. Bell's statement that I harassed her from July 27, 2019 until she was terminated as follows: stopped coming to her desk; would get angry when she asked him questions is that I do not think that is correct. My response to Ms. Bell's statement that when on December 26, 2019 she wanted to ask a question about a database, I got up from my chair as if I was going to leap towards her and got up so close to her that she asked me why I was so angry, although I did not even see the files is that I do not have any knowledge of that. My response to Ms. Bell's statement that on July 25, 2019, I restricted her from working on submittals after she complained about Alexis assigning her work is that Ms. Bell was not allowed to do submittals, because she was having trouble with single steps, and the process had complex steps, too advanced for her at her stage of training. I do not have the knowledge of Ms. Bell's statement that when Brenda Cortez was a

Receptionist, she was her back up during her lunch hour for 2 months from April until mid-part of July 2019 despite never formally being a Receptionist. I do not know Brenda Cortez.

As far as the circumstances of Ms. Bell's termination and who made the decision to discharge her, Mr. Rosado, myself and Senior Leadership, including Alex Medyn (Caucasian), Project Director, discharged Ms. Bell. My understanding of my authority to discharge Ms. Bell is that it was a joint decision, and Mr. Medyn made the final decision, but Bob Rosado made a recommendation for discharge along with Azzam Saad who wanted the letter to be sent properly. The decision was acknowledged and agreed upon by Mr. Rosado, Mr. Saad, and I was a party to the process, and Mr. Rosado was the lead, and I was a party to start the process. I do not know if I needed an approval to terminate Ms. Bell and who at OC405 Partners has the authority to discharge an employee. This is an HR executive level question. Project Director, Mr. Medyn, was the ultimate decision maker. Yes, Mr. Rosado was involved in the decision to terminate Ms. Bell. He was the one that controlled discharge paperwork. I do not know the specifics. I do not know have the knowledge of the reason as to why Ms. Bell was discharged. To answer your question whether I agree with Ms. Bell that the reason given by Mr. Rosado for the discharge was for making two mistakes is that she was discharged for making multiple mistakes. Ms. Bell's position has not been filled since the end of her employment. There is no current Data Management Assistant. No other Data Management Assistant has been hired since Ms. Bell's termination, and no one has been doing her job. I do not have any knowledge of who else was discharged from OC405 Partners for the same or similar reason between 03/11/2019 - 10/09/2019. This is HR question to respond to. There is no additional information I would like to provide.

EEOC Form 133 (10/94)

*I declare under the penalty of perjury that the foregoing is true and correct.*

| DATE | SIGNATURE OF WITNESS | SIGNATURE OF EEOC REPRESENTATIVE | | PAGE | 8 OF 8 |
|---|---|---|---|---|---|
| | | Lina G. Williams | Digitally signed by Lina G. Williams Date: 2021.12.02 09:22:53 -08'00' | | |

PRIVACY ACT STATEMENT:        (This form is covered by the Privacy Act of 1974, Public Law 93-579. Authority for requesting and uses of the personal data are given below.)

1. FORM NUMBER/TITLE/DATE:    EEOC FORM 133, EEOC AFFIDAVIT, December 1993.
2. AUTHORITY: 42 USC 2000e(9), 29 USC 201, 29 USC 621, 42 U.S.C. 12117.
3. PRINCIPAL PURPOSES: Provides a standardized format for obtaining sworn statements of information relevant to a charge of discrimination.
4. ROUTINE USES: The affidavits are used to: (1) make an official determination regarding the validity of the charge of discrimination; (2) guide the Commission's investigatory activity; and (3) in Commission litigation, to impeach or substantiate a witness's testimony.
5. WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR PROVIDING INFORMATION: Voluntary. Failure to provide an affidavit has no effect upon jurisdiction of the Commission to process a charge. However, sworn statements submitted by the parties are, of course, relied upon more heavily than unsworn statements in making a determination as to the existence of unlawful discrimination.

REVERSE OF EEOC FORM 133 (10/94)

EXHIBIT 23.

EMAILS FROM PLAINTIFF, ALEXIS AND PAUL

August 7th, 2019

RE: Submittals

Work was withheld from me

Limits and conditions were put on my training of the submittals and other document.

Paul spoke up for Alexis but failed to do so when he saw Alexis attack me with violence and verbal abuse.

3 pages

**Claudia Bell**

| | |
|---|---|
| **From:** | Paul Straznickas |
| **Sent:** | Wednesday, August 7, 2019 10:34 AM |
| **To:** | Claudia Bell; Alexis Martinez |
| **Subject:** | RE: [OC405-SUB-SWL-W00248] Retaining Sound 699 Excavation Plan Rev001 |

Claudia

*I've been begging for work — begging*

We all work together.

It appears to me you stepped over the line, saying how and what you will do, in reading your email.

Your primary concern is Quality Docs.

In this instance you are supporting Alexis with a Doc Control function.

*Never told es about the green Sheet or Saw it until 8/9/19 about 430 PM —*

We 3 need to talk about this together.

**|OC 405|**
**PARTNERS**

Paul Straznickas
(714) 944-7400 *mobile*
p.straznickas@oc405.com

**From:** Claudia Bell <C.Bell@oc405.com>
**Sent:** Wednesday, August 07, 2019 10:07 AM
**To:** Alexis Martinez <a.martinez@oc405.com>
**Cc:** Paul Straznickas <paul.straznickas@oc405.com>
**Subject:** RE: [OC405-SUB-SWL-W00248] Retaining Sound 699 Excavation Plan Rev001

No Alexis, I will not process these Submittals under these conditions. Either I do the complete Submittal including naming them, etc. or I do none. It is not right for you to take it upon yourself to limit me with these Submittals. That is not training. I don't know what you call it, but I will no longer accept Submittals under these conditions. It's not helping me to be gain proficiency in doing Submittals.

Thanks for any training that you have provided me, I appreciate it. I certainly hope you will continue to be helpful to me when I ask.

Thanks

**From:** Alexis Martinez <a.martinez@oc405.com>
**Sent:** Wednesday, August 7, 2019 9:59 AM
**To:** Claudia Bell <C.Bell@oc405.com>
**Cc:** Document Control Team <DocControl@oc405.com>
**Subject:** [OC405-SUB-SWL-W00248] Retaining Sound 699 Excavation Plan Rev001

Hello Claudia —

Can you please process this material submittal through Aconex package.

## FW: [OC405-SUB-SWL-W00248] Retaining Sound 699 Excavation Plan Rev001

From:   Claudia Bell (C.Bell@oc405.com)

To:     perfect992@yahoo.com

Date:   Wednesday, August 7, 2019, 01:38 PM PDT

**From:** Claudia Bell
**Sent:** Wednesday, August 7, 2019 10:41 AM
**To:** Paul Straznickas <paul.straznickas@oc405.com>
**Subject:** RE: [OC405-SUB-SWL-W00248] Retaining Sound 699 Excavation Plan Rev001

I had no idea I was stepping over the line. I just thought I would be doing complete work. I will do whatever it takes to work as a team, even at the expense of what I feel is a limitation to me.

Thanks Paul

**From:** Paul Straznickas <paul.straznickas@oc405.com>
**Sent:** Wednesday, August 7, 2019 10:34 AM
**To:** Claudia Bell <C.Bell@oc405.com>; Alexis Martinez <a.martinez@oc405.
**Subject:** RE: [OC405-SUB-SWL-W00248] Retaining Sound 699 Excavation

Claudia

We all work together.

It appears to me you stepped over the line, saying how and what you will do, in reading your email.

Your primary concern is Quality Docs.

In this instance you are supporting Alexis with a Doc Control function.

We 3 need to talk about this together.

Paul Straznickas

(714) 944-7400 *mobile*

p.straznickas@oc405.com

**From:** Claudia Bell <C.Bell@oc405.com>
**Sent:** Wednesday, August 07, 2019 10:07 AM
**To:** Alexis Martinez <a.martinez@oc405.com>
**Cc:** Paul Straznickas <paul.straznickas@oc405.com>
**Subject:** RE: [OC405-SUB-SWL-W00248] Retaining Sound 699 Excavation Plan Rev001

No Alexis, I will not process these Submittals under these conditions. Either I do the complete Submittal including naming them, etc. or I do none. It is not right for you to take it upon yourself to limit me with these Submittals. That is not training. I don't know what you call it, but I will no longer accept Submittals under these conditions. It's not helping me to be gain proficiency in doing Submittals.

Thanks for any training that you have provided me, I appreciate it. I certainly hope you will continue to be helpful to me when I ask.

Thanks

**From:** Alexis Martinez <a.martinez@oc405.com>
**Sent:** Wednesday, August 7, 2019 9:59 AM
**To:** Claudia Bell <C.Bell@oc405.com>
**Cc:** Document Control Team <DocControl@oc405.com>
**Subject:** [OC405-SUB-SWL-W00248] Retaining Sound 699 Excavation Plan Rev001

Hello Claudia –

Can you please process this material submittal through Aconex package.

They are flattened and ready to go.

If you have any questions please let me know.

Due date is: 08/13/19

EXHIBIT 24.

The Witch shirt from Traci Boyer was cut, copied and pasted over with no date vs. the Witch Gif dated October 9, 2019, which was the actual gif I received.


This was presented in the Position Statement by OC405 Attorney to the EEOC to mislead them and slander my character even more

3 pages

# Exhibit 12

OC405_00006





Cut and paste
No Date

Actual Email
See above Date
Oct 9 2019

**Traci Boyer**
October 9, 2019 🌐

'It's the Season 🎃



👍 Like          💬 Comment          ↗ Share

Write a comment

**33**

2:43 📶 LTE 🔋

< **Traci Boyer**
Sunday at 7:57 AM · 🌐

•••

This is so right on about me! 🧙



👍 Like   💬 Comment   ↪ Share

**Claudia Bell**
You are a true witch. A wicked one too.
Just now   Like   Reply

Write a reply...

📷 Write a comment...   GIF 🙂

🏠  👥  👤  🫂①  🔔  ☰

2

34